## JENSEN v. LOGAN CITY et al.

No. 5719. Decided May 2, 1936. (57 P. [2d] 708.)

*H. A. Sjostrom,* of Logan, and *Homer Holmgren,* of Salt Lake City, for appellant.

*Leon Fonnesbeck* and *Young & Bullen,* all of Logan, for respondents.

WOLFE, Justice.

The plaintiff caught his foot in the meshes of a wire fence, was thrown to the sidewalk, and injured. He sues the city of Logan and the abutting owners. The undisputed facts are as follows: On the 1st or 2d of March, 1933, a Mr. H. C. Maughan, general supervisor of the Logan City light department, instructed a Mr. Joseph H. Kent, a lineman employed by the light department, to accomplish the removal of a tree which grew on the west property line of the Anderson Lumber Company's property on the east side of Main street in Logan, Utah. In order to remove the tree, about six-

teen feet in length of a wire fence was doubled back on the street side (not on the property side of the fence). Kent testified he removed the wire net fence from the top railing for sixteen feet and from the gate post to which the south end was fastened, and doubled it back for sixteen feet more from south to north, pulling it as tight as he could with the pliers, and fastened the first, third, and fourth strands around the fourth post (counting from and including the post from which that end was removed) ; the posts being approximately eight feet apart. He fastened the "bottom portion by nailing just as good as I could to the fence in order to get clearance from the sidewalk." The wire ends of the strands as they were fastened to their original post were not cut, but the staples were removed and the first, third, and fourth strands were carried around the fourth post and with pliers twisted around the vertical wires of the attached portion of the fence to the north of that post so that initially it may be inferred that the top of the doubled-back portion was even with the top of the undisturbed portion of the fence. Kent testified that there was no part of the fence extending into the sidewalk after he fastened it back. The bottom part was eight or ten inches out from the fence. A snow bank prevented him from pulling in the bottom part closer. After the tree was cut down, he started to replace the fence, when Mr. Nyman (employed by defendant lumber company) told him he could leave it down so they could take part of the tree out that way. He "fastened it back again so it would not be loose."

On March 18th, about 11:30 p. m., plaintiff Jensen was walking with a Mr. Lundberg on the sidewalk near the Anderson Lumber Company property, his foot became tangled in the wire fence, and he was thrown to the ground. The paved portion of the sidewalk was six feet wide. There was about three feet of unpaved portion between the east side of the paved portion and the fence line. These facts are undisputed. The vital question was whether a portion of the doubled-back wire was on the paved portion of the sidewalk at the time of the accident.

Before proceeding with the disputed facts, we shall examine the pleadings in order to determine what issues of fact and law are presented. The plaintiff set out that Logan City, through its agent Kent, with the knowledge and consent of the Anderson Lumber Company, "unnecessarily and unreasonably folded said net wire back upon itself in such negligent and careless manner that the part of said net wire when it was folded, as aforesaid, projected for a distance of one foot out over and upon *the paved portion* of the sidewalk," etc. (Italics supplied. It will be thus noted that the one act of negligence charged to the city is involved in the manner in which the dismantled portion of the fence was originally fastened and concerns the condition in which it was originally left after it was fastened. This charges commissive negligence, being the creation of a dangerous condition. There is nothing in the complaint which would impugn such negligence to the abutting owner, the defendant lumber company. It is not claimed the city was acting as its agent. The complaint then proceeds to charge both parties with omissive negligence in leaving and permitting a dangerous condition to exist and continue on the sidewalk. It states, "they [both defendants] wrongfully, negligently," etc., "permitted said wire to remain so extended out over and upon said sidewalk as aforesaid [e. g., over the paved portion thereof] * * * for a period of approximately four weeks * * *." The complaint also alleges that the defendants "well knew or should have known a long time prior to the 18th day of March, 1933, that said dangerous condition existed." There are allegations which are repetitions but, more amplifying of the nature of the dangerous condition and knowledge, actual or constructive, of defendants.

It will thus be seen that the city is charged with negligently creating a condition, and the city and the lumber company with negligently permitting it to exist after they had the duty to remove it. The complaint narrows the dangerous condition as one existing on the *paved* portion of the sidewalk. We shall see later whether the matter of whether the condition on the three feet between such portion and the

west fence line of the lumber company's property is drawn into consideration through expansion of the issues in the trial or by reason of the law applicable to the situation. The defendants after separately denying all the acts of negligence alleged, each separately set up as affirmative defenses that the injuries of plaintiff were "caused by the negligent acts of plaintiff * * * and that said injuries were contributed to by the negligent acts of plaintiff."

The case was tried to a jury; verdict was for the defendants; and the special interrogatory reading, "was the wire in which the plaintiff alleges he caught his foot projecting out over part of the paved portion of the sidewalk at the time of the accident?" was answered in the negative by the jury.

The assignments (1 and 2) assail rulings admitting and rejecting evidence. H. R. Pederson, the city auditor, was permitted to answer, over objection, the question, "Did any one ever speak to you, or complain about any obstruction on the sidewalk at that point?" The objection was well taken. Plaintiff was obligated either to prove actual knowledge on the part of the city or constructive knowledge. If he proved actual knowledge on the part of those charged with the duty to keep the sidewalks clear, it was immaterial whether any complaint had been made. Constructive knowledge arises by virtue of the fact that the condition exists for such length of time that the city reasonably should have taken notice of it and is therefore charged as if it had actual notice. Whether or not any one complained of the condition is immaterial, except as it might be introduced by plaintiff to show that some one did complain, and therefore that the city did have actual knowledge. But that some one did *not* or no one did complain is immaterial to constructive knowledge. The jury determines under all the circumstances, and from the time the condition existed, whether the city should have taken notice. But the error is nonprejudicial. Cases are not reversed for such errors.

One Bench, a witness for the defendants, was asked on cross-examination if plaintiff had not asked him if he had

observed the wire. He said he did not remember plaintiff asking him this. One Godfrey, defendants' witness, was asked on cross-examination if he had not said to plaintiff that he did not remember anything about the fence. He answered: "No." Plaintiff sought to impeach by asking Jensen, the plaintiff, the following:

"Mr. Jensen, you heard the testimony of Mr. Bench and Mr. Godfrey?   A. Yes, sir.

"Q. I ask you whether or not you ever had a conversation with them relative to the fence being out on the sidewalk?   A. I did.

"Q. What did they say to you relative to the fence being out on the sidewalk?"

Here was interposed an objection on the ground that it was hearsay, incompetent, and as not rebuttal, and the objection was sustained. Obviously, if Bench testified that he had observed the wire but told Jensen that he had not particularly observed it, and then on the stand said he remembered nothing about Jensen asking him if he had made any particular observation, such evidence by Jensen, if the jury believed him, would certainly have tended to impeach the witness Bench. Likewise, if Godfrey on direct examination had testified concerning the fence and on cross-examination testified that he did not recall telling Jensen that he did not remember anything about the fence, and Jensen could state that he had so stated to him, it would tend to impeach his testimony concerning the position of the fence. Even where a witness states he does not remember any conversation with the proposed impeaching witness, that part of the alleged conversation which it is claimed would impeach him should be called to his attention, for it may yet serve to refresh his memory and give him the required opportunity to deny it specifically, or, if admitting it, to qualify or explain it or testify as he thinks it actually took place. This was not done with the witness Bench. Godfrey was asked specifically whether he recalled saying to Jensen that he did not remember anything about the fence. But the impeaching question coupled the matter of a conversation generally

with both witnesses and did not ask Jensen whether Godfrey had said he did not remember anything about the fence. Hence it was not in proper form. It is not necessary to be highly technical about the putting of questions to form the basis of impeachment nor in putting the impeaching question. A too specific question may be correctly denied because it is impossible to put to a witness the exact words which he may have used in a former utterance and the impeaching question may suffer from the same infirmity that no one could say that such exact words were used. The witness might escape through a negative pregnant. Moreover, a bald question without any approach may lose the naturalness which has surrounded its former utterance. On the other hand, the question must contain the meaning which the witness conveyed and as far as possible use the words he used to convey that meaning. The impeaching question against Godfrey directed to Jensen was different than the question which endeavored to lay the basis for impeachment. Under these circumstances the ruling of the court was correct.

Assignment No. 3 assails the correctness of instruction No. 4, which reads:

"There is no evidence that either the employee of the city, Joseph Kent, or employees of defendant Anderson Lumber Company were negligent in placing the wire in a dangerous or hazardous position over part of the paved portion of the sidewalk and these alleged acts of negligence are withdrawn from the consideration of the jury."

The instruction was correct. There was no evidence disputing Kent's and Nyman's evidence of the manner in which the dismantled end of the wire fence was refastened and its position on the doubling back. The dispute in the testimony comes in the main on the question of whether the fence later protruded on the paved portion of the sidewalk and how long it so remained if it did protrude, and also on the question of whether it so protruded *at the time of the accident.* There is no evidence that the city initially permitted it to protrude. The evidence that people later saw it so is not

evidence from which such inference can be drawn because such evidence was too remote. The intervention of third persons or of natural forces acting on what might have been initially a well-fastened fence may have disposed the fence to a position partially across the paved portion of the sidewalk, and unless there was evidence that it was seen so within a reasonable time after the actual fastening back of the doubled part, such evidence is not probative of the fact that it was originally so left. We shall later be required to discuss more at length this matter of the presumed continuance of a state of things. In ensembles that have an inherent degree of permanency, an inference may arise that they were in the same state a certain time before, but the greater the element of unstability inherent in the state of a configuration, the greater the probability of change and the nearer in time to the initiating of the condition must be the observation. It needs no authorities to support this. Reasoning alone suffices.

The instruction, moreover, was directed to exculpating the lumber company from negligence in initiating the situation. There is no evidence which makes Kent or his principal, the city, the agent or joint venturer with the lumber company in taking down the tree. The city appears to have done it as a make-work project, although the request and suggestion seems to have come from Nyman, who was employed by the lumber company. But the project was under the city's supervision and prosecution, without interference, instruction, or guidance by the lumber company. There was no agency or anything therefore to impute to the lumber company negligence, if any, in the initial fastening of the doubled portion of the fence. The instruction was certainly correct, therefore, as far as the lumber company is concerned. But it is contended that if the fence was so folded and fastened as by natural causes such as the melting of snow or its own flexibility, to later protrude, it would be equivalent for the purpose of pleading and evidence to defectively placing it there in the beginning. Granting, for the moment, that proof that a fence so defectively fas-

tened as to be the easy prey of natural forces which work it into a danger, is equivalent to proving the allegation that it was initially so placed, yet there must be something in the subsequent situation from which it can be inferred that that situation was caused by initial carelessness. Just the evidence that the wire was sometime later observed partly across the paved portion will not be sufficient to base an inference that it became so because of the prey of such natural forces for the reasons above mentioned. It was held in *O'Hara* v. *Laclede Gas Light Co.*, 244 Mo. 395, 148 S. W. 884, that the fact that large pipe lay in the street for three and a half hours without rolling was evidence that such pipe had initially been securely blocked. Thus the inference of initial security was taken from the fact that the secured state remained for a certain length of time. But the inverse inference was not permitted, to wit, that because the pipe after three and a half hours did roll that it was initially left in a condition where it might roll. Certainly where a condition has existed for a considerable length of time so as to give way to the slow play of natural forces, or where intervening agencies not natural forces may effect a change, no inference that the initial state was insecure or unstable can be inferred from the later state. Any state may in time change from one of safety to one of danger; the more inherently permanent the original state, the longer generally will such change require; but in no case is evidence of a subsequent dangerous state when such observations are too remote from the initial state, evidence that the initial state was dangerous. For instance, a wire fence doubled back for a considerable length of time, originally in a safe condition, might change to an unsafe condition. Here again the matter of whether an inference is permissible involves the nature of the ensemble under consideration, the time beyond which it is too remote for such inference being somewhat roughly inversely proportional to the instability of the state of affairs as originally established; or, put in another way, somewhat directly proportional to the inherent stability of such original state. The illustration of the soap bubble and the

mountain given by Wigmore, infra, exemplifies the proposition. Whether an inference that a certain state was initially created may be drawn from evidence that it was seen in that state at a certain time after initiation depends on the circumstances surrounding the establishment and existence of the object whose  states of being are in controversy, together with the inherent ability or inability of the object to resist changes of status. The probativeness of such evidence is somewhat a matter for the trial court. If reasonable minds could reasonably differ as to whether or not such evidence was too remote to have probative value, the ruling of the lower court would not be disturbed whichever way that ruling went. In this case, therefore, we are of the opinion that the court did not err when it held that the evidence of the state of affairs some time after Kent fastened back the fence had no probative value on the issue as to how the fence had reposed at the time he fastened it, nor that it can be said to be probative of the fact that he so inadequately fastened it that it later by natural causes protruded for that reason over the paved portion of the sidewalk, if indeed the allegation that he had originally set it up so as to protrude across the sidewalk takes in an issue that it was so negligently fastened that it was disposed by natural forces later to be across the sidewalk. The above being as stated, instruction No. 4 was properly given.

In assignment No. 4 plaintiff complains that the court erred in refusing to give his requested instruction No. 1, to the effect that the plaintiff had the right to assume, in walking upon the sidewalk, that the same was free from obstructions. We fail to see the office of such an instruction under all the issues of this case. If the wire was on the paved portion of the sidewalk, no issue of contributory negligence in not noticing it was in the way of plaintiff's recovery. Either one or both defendants were liable without resort to any assumptions which plaintiff might entertain respecting obstructions or lack of them on that portion of the sidewalk. If the wire was not on the paved portion but on the three-foot space, any assumption

that plaintiff might entertain, that the paved portion was clear, was not relevant. If the requested instruction goes to the extent of implying that it is the law that the city is under obligation to keep not only the paved portion marked for travel, but the whole of the sidewalk clear of obstructions, consideration of such implication will appear in connection with our treatment of assignment No. 5 next hereunder, and will be found not to be applicable in the form submitted. No error was committed in refusing said requested instruction No. 1.

Plaintiff complains in assignment No. 5 of the court's refusal to give his requested instruction No. 5, reading as follows:

"You are instructed that if the property of the abutting owner is placed in the street or on a sidewalk by a third person or stranger so as to constitute an obstruction or unsafe condition in said street or sidewalk, that said abutting property owner is liable for injury resulting therefrom; provided he knew or should have known of the existence of such defect or obstruction."

The law asked for in the instruction was substantially covered by instructions Nos. 7 and 11. It is true that the wording of these two instructions of the court rather emphasized the situations in and limits beyond which an abutting owner would not be liable and bore down on the negative duty of refraining from putting obstructions ■ on the sidewalk, rather than his affirmative duty of removing obstructions involving his own property, when he knew actually or constructively that his own property was forming a hazard. The affirmative duties were brought in as exceptions to the absence of duty when the owner had not himself placed or aided in placing the obstacle on the sidewalk. The instructions were not as evenly balanced between the parties as we might prefer in a court's instruction; yet they correctly reflected the law which plaintiff enunciated in his requested instruction. It is impossible to achieve perfection in the necessary expedition with which jury trials must be conducted. The refusal

was not error in view of the court's instructions Nos. 7 and 11.

In assignment No. 8, plaintiff assails the submission by the court of the issue of contributory negligence, asserting that the defendants in their pleadings have not sufficiently raised it. The reader is referred back to that part of the opinion which sets out the wording of defendant's defense in that regard. The language in each defendants' answer varies a little, but each charges contributory negligence generally without specifying the particulars. Is this sufficient? It must be kept in mind that if a complaint on its face shows contributory negligence, it will defeat the statement of a cause of action. *Birsch* v. *Citizens' Elec. Co.*, 36 Mont. 574, 93 P. 940. By the same token, even if contributory negligence is not pleaded but appears in plaintiff's evidence, the question will be put to the jury. *Glass* v. *William Heffron Co.*, 86 Ohio St. 70, 98 N. E. 923; *Kofoid* v. *Beckner*, 70 Cal. App. 624, 234 P. 113; *Riley* v. *Good*, 142 Or. 155, 18 P. (2d) 222, 226; *Birsch* v. *Citizens' Elec. Co.*, supra.

The reason is that plaintiff is not relieved from the necessity of "establishing the allegations of his complaint by evidence of such facts and conduct on his part, free from inferences that may reasonably be drawn therefrom tending to show that he was not without negligence in connection with the acts complained of." *Riley* v. *Good*, supra.

There has been some confusion as to whether a plea of *contributory* negligence was one in the nature of a negation of plaintiff's allegation that defendant's negligence caused him injury or whether it was a plea in confession and avoidance. 5 Encyc. of Plead. & Prac. 12, states that it is a plea in confession and avoidance. This gives rise to difficulties. If it is a plea in confession and avoidance, how can one deny his negligence and yet admit it, but allege that the other's negligence contributed and hence for that reason he is not liable? Pleading the general denial and

contributory negligence seems in such case to involve inconsistent defenses. Contributory negligence assumed that the pleader of it himself was guilty of negligence, but that if it were not for the negligence contributed by the plaintiff the injury would not have happened. In the case of *Edlefson* v. *Portland Ry., Light & Power Co.*, 69 Or. 18, 136 P. 832, it was held that a plea that plaintiff was *solely* liable because of negligence was not one of confession and avoidance and therefore not inconsistent with a general denial. Other cases have held that under a plea of plaintiff's sole negligence, evidence of contributory negligence may be admitted. *Elliott Jobbing Co.* v. *Chicago, St. P., M. & O. Ry. Co.*, 136 Minn. 138, 161 N. W. 390, 391. In this case the court said:

"The argument is that the allegation quoted is an averment that the plaintiff's negligence solely caused the damage, and that it negatives the negligence of the defendant charged in the complaint, though unnecessarily so, since it is put in issue by the general denial, but that it is not an averment that the plaintiff's negligence contributed with that of the defendant in doing the wrong and indeed is inconsistent with such a charge. The logic of the argument is appreciated. We do not minimize its force. The rules of pleading are more a means than an end. The thing desired is that controversies may be litigated in an orderly manner and fairly to the parties. It is the long-established practice in this state to receive evidence of contributory negligence under an affirmative allegation that the plaintiff's negligence was the cause, or the sole cause, of the injury. This is a common form of pleading. It is the understanding of the bar that it permits proof of contributory negligence."

Contra: *Birsch* v. *Citizens' Elec. Co.*, supra; *Cogdell* v. *Wilmington & W. R. Co.*, 132 N. C. 852, 44 S. E. 618; *Ramp* v. *Metropolitan St. Ry. Co.*, 133 Mo. App. 700, 114 S. W. 59; *Newport L. & A. Turnpike Co.* v. *Pirmann*, 82 S. W. 976, 26 Ky. Law Rep. 933. It would be difficult under such circumstances to hold otherwise, because until the evidence was all in it might be next to impossible to determine whether the injury was due solely to the plaintiff's negligence, solely to the defendant's, or whether they concurred to produce the accident. And if there is any evidence of contributory negli-

gence which was properly admitted in the case, the jury must be guided by instruction in regard thereto. The upshot of the matter is that in many cases the matter of contributory negligence, whether pleaded by the defendant specially or not, comes in by plaintiff's evidence or because, under a general denial or plea that the accident was due solely to plaintiff's negligence, the evidence necessarily raises the question of contributory negligence and thus raises, as held by the case of *Riley* v. *Good,* supra, a requirement on the part of the court to instruct relative to it. It is the recognition of these facts which has lead to the lack of technical requirements in pleading contributory negligence. In many cases it will enter whether pleaded or not. Moreover, there is a tendency now to view contributory negligence not as a plea in confession and avoidance, but as directly defeasive of plaintiff's cause of action and, therefore (if it were not for custom and the practical consideration of putting plaintiff on notice of what he had to meet), of treating it as admissible under the general denial. And, indeed, the reasoning is not without validity. If plaintiff has been guilty of negligence which contributed to the accident, the injury has not been caused by the defendant's negligence but by both negligences; consequently by denying the allegation that the negligence of defendant caused the accident, defendant not only denies that he was negligent, but denies that his negligence, if any, caused the injury. If he can show that the contributory negligence of plaintiff caused or contributed to it, it may be said, not without reason, that he has established his denial of the allegation that his own negligence caused it. It is because courts, on the one hand, felt that contributory negligence logically might be shown under the general denial, and yet, on the other hand, believed it was only fair that the plaintiff should be notified at least generally that the defendant intended to rely on contributory negligence, that they required it to be specially pleaded. See 45 C. J. 1115, § 692, and cases under note 81; *Smith* v. *Ogden & N. W. R. Co.,* 33 Utah 129, 93 P. 185; *Holland* v.

364

*Oregon S. L. R. Co.*, 26 Utah 209, 72 P. 940. But in the absence of a special demurrer or motion to make more definite (in jurisdictions having this type of motion), a plea setting out contributory negligence generally without particularizing as to the manner, is sufficient. *Broman* v. *Kimball*, 112 Kan. 186, 210 P. 191; *Kirkland* v. *Atchison, T. & S. F. Ry. Co.*, 104 Kan. 388, 179 P. 362; *Griswold* v. *Pacific Elec. R. Co.*, 45 Cal. App. 81, 187 P. 65; *Brown* v. *Seattle City Ry. Co.*, 16 Wash. 465, 47 P. 890; *Chicago, B. & Q. R. Co.* v. *Oyster*, 58 Neb. 1, 78 N. W. 359. In the light of our case of *Freedman* v. *Denhalter Bottling Co.*, 54 Utah 513, 182 P. 843, which held the allegation "negligently drove," contained in a complaint, good against a general demurrer, a liberal view of the sufficiency of a plea of contributory negligence, where a special demurrer has not been interposed, should be taken. At page 1120 of 45 C. J. § 699, it is stated:

"And even in jurisdictions in which contributory negligence is generally required to be specifically alleged, a general averment thereof is sufficient unless objection is made thereto before trial, such as by demurrer, or by a motion to make more definite and certain, especially where the general allegation is sufficient to advise plaintiff of defendant's intention to insist on that issue on the trial. In accordance with these rules, objection to a general averment of contributory negligence cannot be urged by plaintiff where he replies to the plea or answer without raising such objection."

Thus, on the objection that the pleading was not sufficient to tender the issue of contributory negligence, assignment No. 8 must be overruled. But plaintiff assigns in addition the ground that there was no evidence that plaintiff was guilty of contributory negligence. We shall consider this question in connection with plaintiff's assignments Nos. 7, 11, 12, and 13.

In assignment No. 7 plaintiff attacks the court's instruction No. 13, wherein the court charged that it was the duty of plaintiff to pursue the paved portion of the sidewalk prepared by Logan City and that if they found that plaintiff

departed therefrom intentionally or heedlessly, he did it at his own risk. Plaintiff contends there is no evidence to show that he walked off the paved portion, but on the contrary the uncontradicted evidence is that he was walking on the paved portion when he tripped. For this same reason, plaintiff asserts in assignment No. 13 that there was no evidence to support the answer of, "No," given to the interrogatory as to whether or not the wire on the pavement at the time of the accident, set out pro haec verba in the beginning of this opinion, and that because of there being no evidence from which the jury could answer the question other than in the affirmative, there was error in submitting the interrogatory (assignments Nos. 11 and 12). The solution of all these questions depends upon whether there was evidence that the wire was off the paved portion *at the time plaintiff tripped;* for if it was off that portion, the jury must have deduced that plaintiff must have been off the paved portion when he tripped. The issue presented is as to whether the wire was on the paved portion at the very time of the accident, not afterwards nor before that time. The only evidence that such wire was not on the pavement at such time must be derived, if at all, from evidence that it was not there previous to said time. There were witnesses who testified that they had seen or contacted the wire on the paved portion at various times extending from eight or ten days before the accident to the afternoon of the accident. There were other witnesses who said they did not see the wire on the paved portion when they passed the place of the accident either on the day of the accident or before that day. Of course, evidence as to whether the wire had been on the pavement before the time of the accident was relevant to show a condition which had or had not existed sufficiently long for the defendants to take notice of whether a dangerous condition existed. It may also serve to show the mobility of the object under consideration—its on and off nature. Was any of the testimony of these witnesses probative on the question of whether it was or was not on the pavement

*at the time of the accident?* If it was, it must be on the theory that a state of affairs testified to exist before the accident could be the basis for an inference that it was the same at the time of the accident. Under the consideration of plaintiff's assignment No. 3, above, we have partly discussed the principles governing the field of permissible inferences. Where the situation has inherent in it the likelihood of a change of state or the circumstances are such as to present opportunities for either natural forces or the intervention of persons or animals to cause a change in the situation, the testimony of a state presumed to continue must be fairly near the time of the event it is presumed to continue to and the more volatile the situation the nearer to the event must the observation be in order to become probative. This does not involve the relative worth of negative or positive testimony, but the question of whether it is legitimate to permit an inference to be made at all from evidence that a status existed at one time, that it existed at a time subsequent thereto.

Between certain limits it must be left to the trial court to determine whether the observations of a witness were too remote to be probative. The trial court knows the nature of the configuration which it is claimed was or was not easily susceptible of change. In certain cases any one can say the time between the observation and the event was not too long or that it was too long. If an accident happened one moment after the witness had observed the situation, it would take something very susceptible of rapid change or circumstances surrounding which might very probably effect a quick change, for the court to say it was too remote; on the other hand, if it was observed days before the accident, it would take a situation inherently very stable to say that it was not too remote. It is that class of cases which lie in zone where minds could reasonably differ as to whether the observation was too remote. Wigmore says the matter should be left entirely to the trial judge's discretion. 1 Wigmore on Ev. 517, § 438.

In the case at bar the loose corner of the doubled part of the wire fence was certainly susceptible of a change of position. The very conflict in evidence between those who testified that they saw it on the pavement and those who testified that they did not may serve as well to indicate that this loose end shifted either by the play of the elements or by being kicked back, as it may serve to show that it never or always was on the pavement. However, that was for the jury to determine. The witness who testified to the absence of the wire on the pavement at the time nearest to the accident was Holden, who said it was not there when he passed some time between 9:30 and 10:30 the evening of the accident. We think his testimony was probative and competent to the point of furnishing the basis for an inference that the wire was not on the pavement at 11:30 p. m. when the accident took place.

"When the existence of an object, condition, quality, or tendency at a given time is in issue, the *prior existence* of it is in human experience some indication of its probable persistence or continuance at a later period. The degree of probability of this continuance depends on the chances of intervening circumstances having occurred to bring the existence to an end. The possibility of such circumstances will depend almost entirely on the nature of the specific thing whose existence is in issue and the particular circumstances affecting it in the case in hand. That a soap-bubble was in existence half-an-hour ago affords no inference at all that it is in existence now; that Mt. Everest was in existence ten years ago is strong evidence that it exists yet; whether the fact of a tree's existence a year ago will indicate its continued existence to-day will vary according to the nature of the tree and the conditions of life in the region. So far, then, as the *interval of time* is concerned, no fixed rule can be laid down; the nature of the thing and the circumstances of the particular case must control." 1 Wigmore on Ev. 514, § 437.

Notes to section 267, Jones' Comm. on Ev. p. 438, and notes to section 437, Wigmore on Evi., present numerous cases involving different situations which it was attempted by evidence, either admitted or refused, to show that a certain condition continued subsequent

to the time of observation, but in none of the cases was the evidence by which it was sought to base an inference of continued nonpresence of an object negative in its character. On principle it should make no difference, because the matter involves just two elements: (1) Proof of the status at a certain time. (2) Can it be inferred from the status as it appeared at that time that it was the same at a later time? Whether this inference can be made depends upon the principles herein set forth. But if the inference is a legitimate one, the nature of the proof required to establish the basis for the inference would be the same as that required if the basis were itself the ultimate fact desired to be proved. Concretely put, if the fact to be proved was the position of the wire at 9:30 p. m., and that can be proved by negative testimony, then if such fact is to be proved not for the sake of the fact itself but as a basis for the inference that such was the condition at 11:30 p. m., the same sort of testimony competent to prove it when the issue was as to what its condition was at 9:30 should be admitted to prove what its condition was at 9:30 in order to make that condition the basis for an inference as to what its condition was at 11:30 p. m.

Of a large number of cases examined, that of *Cleveland, C., C. & St. L. Ry. Co.* v. *Starks,* 58 Ind. App. 341, 106 N. E. 646, appears to throw the most light on the matter of determining what is the legitimate field of inferences. We refer the reader to that case for an able exposition of the principles governing in the determination of whether an inference that a certain state exists may be made from the fact that it existed prior thereto. The principles deduced are briefly as follows: (1) It is for the court in the first instance to determine whether the fact sought to be inferred is one which comes within the legitimate field of inferences. (2) In so determining there must be (a) established a fact or collection of circumstantial facts bearing some relation to the fact to be proven; (b) the relationship must rise above the realm of the merely conjectural or speculative into the reasonably probable. The court first determines whether

these elements exist from the entire situation including the element of the inherent stability or instability of the ensemble and the circumstances surrounding it which show the presence or absence of intervening agencies likely to effect a change. (3) If the court determines that the inference sought to be made is within the legitimate field of inferences, i. e., beyond the realm of guess, speculation, or mere conjecture, it is for the jury to determine whether it will accept the inference and what weight should be given to it. In the Starks Case it was held that it could not be inferred from the fact that the curtains of the buggy were up four miles from the scene of the railroad accident that they remained up all the way. It was a cold February day, snowing some, and the wind was from the northwest. The curtains were for the very purpose of protecting the driver from such inclement weather; a single impulse or volition acted upon would accomplish their lowering. As far as the testimony that the curtains were up four miles before the buggy was struck is concerned, it could throw no light on the question of whether they were up or down at the time of the accident. As far as that testimony was concerned, it was just as much a guess or speculation as if the testimony had not been given. The elements did not comport to the principles heretofore laid down.

The case at bar is on the border line. We have no equipment like a curtain which was designed for the manipulation by a human or circumstances which would make it just as likely at least that he did manipulate as that he did not. If the wire was not on the pavement at 9:30, there is a basis for the inference of a probability that it was not there at 11:30 unless there appears in the case some element which would negative this probability. There is no evidence which would give us a clue to the inherent nature of the bottom part of the doubled portion of the fence which could not be fastened on account of the snow bank or of any loosening of such bottom part from which inferences could be drawn as to its ability to move back and forth, and

the extent if it could so move. There is a specimen of the fence in evidence. Some slight deduction as to whether it would be easily moved by winds or by any movement of the fixed fence to which it was attached might be made from this. We cannot say that the whole set-up of the wire, as far as the evidence reveals the manner of its attachment, taking into consideration its stiffness, was so inherently unstable in its ability to retain a certain position or so at the behest of humanly applied force as not to bring within the field of legitimate inferences a deduction from its position at 9:30 p. m. that it was in the same position at 11:30 p. m. At least, the situation is not such as to compel us to say that the trial judge abused his discretion in finding that the evidence of the situation at 9:30 was the basis for a legitimate inference as to the situation at 11:30. The consequence is that we have a conflict of evidence as to the state of the wire at 11:30 when the accident took place, and therefore a question for the jury. The fact that the jury gave the inference more weight than the direct testimony of Jensen and Lundberg cannot affect the result. The jury could judge of the credibility of these two witnesses. Moreover, if the evidence fairly preponderated in favor of the wire being on the pavement at the time of the tripping, the trial court in its discretion could have set aside the verdict for that reason. We cannot interfere with that discretion unless there has been a clear abuse of it. See *Valiotis* v. *Utah-Apex Min. Co.*, 55 Utah 151, 184 P. 802. We cannot say here that there was a clear abuse of that discretion. The trial court had a chance to study the demeanor of the witnesses Jensen and Lundberg, who gave the only affirmative evidence of the whereabouts of the wire at 11:30 p. m. It results, therefore, that assignments Nos. 7, 11, 12, and 13 were in that regard not well taken.

Under assignment No. 7, plaintiff also contends that the court's instruction that it was the duty of plaintiff to pursue the paved portion of the sidewalk was wrong law. This contention is based on the ground that if a dangerous condition

is left so close to the sidewalk or traveled portion as to be a danger to those reasonably using such portion, the person responsible for putting it there, and the abutting owner if his property is involved, and the city if it had actual or constructive notice, are liable just as they would be liable if left on the part designated for travel. *Lund* v. *Seattle*, 99 Wash. 300, 169 P. 820; *Town of New Castle* v. *Grubbs*, 171 Ind. 482, 86 N. E. 757; *Miller* v. *Missouri Wrecking Co.* (Mo. Sup.) 187 S. W. 45; *Cedarland* v. *Thompson*, 200 Mo. App. 618, 209 S. W. 554 (the last two cases being where the danger came to the pedestrian on the sidewalk rather than he going to it); *Long* v. *Amer. Ry. Express Co.*, 150 La. 184, 90 So. 563, 22 A. L. R. 1493 (where the grass parkway was considered as part of the sidewalk at least as far as the right of children to go thereon was concerned), cited by plaintiff, all support the proposition above enunciated.

Defendant lumber company contends that where the city prepares and lays out a part of the whole street or part of a whole sidewalk for travel, the part by its nature being the part plainly designed for travel and being reasonably adequate to take care of the ordinary traffic thereon, no duty devolves on the city or the abutting owner to keep the undesignated portion free from danger, and that if a pedestrian or traveler departs from the designated portion intentionally, he does so at his own peril, for there is no implied assurance that such portions are free from obstruction or danger. The following cases are cited and support this proposition: *City of Birmingham* v. *Carle*, 191 Ala. 539, 68 So. 22, L. R. A. 1915F, 797; *Herndon* v. *Salt Lake City*, 34 Utah 65, 95 P. 646, 131 Am. St. Rep. 827; *Smith* v. *Rexburg*, 24 Idaho, 176, 132 P. 1153, Ann. Cas. 1915B, 276; *Register* v. *City of Pittsburg*, 139 Kan. 753, 33 P. (2d) 173; *City of Hannibal* v. *Campbell* (C. C. A.) 86 F. 297.

*Oliver* v. *City of Denver*, 13 Colo. App. 345, 57 P. 729; *Morse* v. *Incorporated Town of Castana*, 213 Iowa, 1225, 241 N. W. 304; and *Snyder* v. *City of Superior*, 146 Wis. 671, 132

N. W. 541, seemingly belong rather to the class of
cases mentioned by plaintiff, the obstruction being so
close to the portion designated for travel as to have
caused injury to a person reasonably using such portion.
The last-mentioned case would appear to us to have been
wrongly decided. We have doubt as to the Oliver Case, and
still more as to the Morse Case. The groups of cases cited
by plaintiff and defendants are not (except perhaps the last
three named) in opposition, but illustrate different prin-
ciples. One set supports the proposition that an obstruction
placed so near to the traveled portion of the road as to con-
stitute a danger to one *reasonably* using such portion will
give rise to liability. And reasonable use of said portion
designated for travel includes the probability that one may
in pursuance of such *reasonable* use inadvertently or with-
out fault step off or momentarily, because of confusion,
darkness, or other excusable reasons, depart from such por-
tion. A fence or guard or some elevated border where the
topography of the land, such as an embankment, terrace, or
slope makes it reasonably necessary or desirable, may not
be included in the class of such obstructions or so-called
traps. Whether or not a structure or object constitutes a
menace or a danger of course depends upon all the circum-
stances. The other class sets out the rule that where one
ceases by deliberation or intention to use the designated por-
tion, he can be said no longer to be reasonably using it and
he goes thereafter on his own responsibility. It is common
sense that if something in such juxtaposition to the sidewalk
interferes with the reasonable use of the latter, the person
responsible for the maintenance or under duty to remove it
will be responsible for injury. Instruction No. 13, there-
fore, may correctly state the law. We need not now decide
that question. But if it does state the law, what evidence
is there that plaintiff intentionally departed from the paved
portion of the sidewalk at the time of the accident? He and
Lundberg, his companion, both testify that he was on the
paved portion when he was tripped by the wire. We have

seen that there was a modicum of evidence that the wire *at 11:30* was not on the pavement because it was not there at between 9:30 and 10:30 p. m.; hence, there was possibly a deduction by the jury which evidently it made that plaintiff walked off the paved portion and thereby tripped over the wire. But how far off did he walk? Was it intentional or by distraction? None of these elements appear in the evidence. Therefore, on the jury's finding there is an unexplained zone of happenings in which neither the plaintiff's theory that the wire if not on the paved portion was so near thereto as to constitute a menace to the reasonable use thereof, nor the defendants' theory that the wire was two to two and a half feet from the paved portion and that plaintiff intentionally or at least materially departed from the paved portion, were supported by evidence. The evidence being blind in respect to the matter in which the instruction was given, the instruction was erroneous. But everything considered, the instruction could not have been prejudicial. The pleading of the plaintiff alleged that the wire was placed on the paved portion (commissive negligence) or permitted to remain there (omissive or permissive negligence). It made the paved portion the area of controversy and defendants were required only to meet the issue tendered.

The court's instruction No. 6 stated:

"If you believe from the evidence that no portion of the fence * * * protruded out upon the paved portion * * * at the time of the * * * injury, then plaintiff cannot recover against said defendants."

The issue was thus definitely held to whether the wire was on the paved portion. It is difficult to see why, in view of this instruction, the court gave instruction No. 13. But no exception was taken to instruction No. 6, so counsel evidently conceded that the issue must be confined to whether the wire protruded on the pavement. Moreover, if we can construe the pleading to take in not only negligence in placing or leaving the wire to remain on the

paved portion, but leaving it so close to the paved portion as to interfere with plaintiff's reasonable use of the former, we meet the next proposition, that at least plaintiff is under duty to prove such allegation expanded for his benefit. All the evidence was directed not to such issue but as to whether it was off or on the pavement. Not having made proof of such enlarged allegation, there was no occasion for the court to instruct as to the law regarding traps placed too close to the paved portion as to interfere with the reasonable use thereof. Yet, by implication the court did so because it limited the responsibility of plaintiff for his departure to an intentional and heedless departure, which implied that if he departed inadvertently or unintentionally and was injured he would not be charged thereby with negligence. In that regard, the instruction was favorable to plaintiff when there was no evidence to make it apply. But it also tended to make the jury think there was evidence that he had intentionally, heedlessly, or materially departed from the pavement because otherwise it (the jury) would have reasoned there was no occasion for the instruction. It may be said that the jury by its special verdict found as a fact that the wire was off the pavement and therefore must have concluded that it was far enough off not to be a menace to a person reasonably using the pavement. If they thus concluded, they were wrong, because there was no evidence as to how far off it was at 11:30 of March 18th. But plaintiff cannot complain of such false conclusion, if it were made, because when he failed to convince the jury that the wire was on the pavement according to his theory, he supplied no evidence from which it could conclude that it was at least so near the pavement as to be still a menace, if indeed that was within the issues. Under such a state of the evidence when the jury once found that the wire was not on the pavement it could conclude, especially in view of instruction No. 6, that defendants were not liable regardless of the position of the wire on the dirt portion; and the thirteenth instruction did not in any sense encourage such conclusion any

more than it discouraged it. That conclusion must have been reached from the evidence in the case regardless of instruction No. 13. Hence, the instruction could not have been prejudicial. Consequently, assignment No. 7 is not well taken in any regard.

By assignment No. 10, plaintiff assails instruction No. 19 to the effect that the defendant lumber company was not bound by any statement made by Elizabeth Frederickson, a witness called solely by Logan city, "to plaintiff or his counsel or to any other person." Mrs. Frederickson testified that she made a statement on the afternoon of March 18th to one Johnson while he was standing near the open part of the fence, as follows: "You don't care very much about our stockings; we might snag them on this fence." No objection was made or motion to strike this statement which appears to have been incompetent. The statement involved her opinion as to the ability of the fence to snag stockings. It was not competent evidence, but it got in without objection, as well it might, because plaintiff would most likely relish it and the defendant city not be in very good position before the jury to strike it, although the lumber company could have so moved. Plaintiff says that while the lumber company was under no necessity to impeach the witness, she being Logan City's witness, the statement showed the physical fact of the menace of the wire and such fact was evidence against either defendant. The instruction states that the lumber company was not bound by statements "to plaintiff or his counsel or to *any other person.*" The reference to statements "to plaintiff or his counsel" evidently refers to matters touched on in plaintiff's cross-examination in which, by way of affecting credibility, endeavor was made to make the witness admit that she had made certain statements to plaintiff's counsel. There were no questions regarding witnesses making statements to the plaintiff. The situation is this: A witness, put on by one codefendant to give testimony which would be favorable to both defendants, testifies to a statement she made to a bystander at the time she made her

observation, which statement is admitted without objection and the import of which is favorable to plaintiff's theory. In order to shake the credibility of that part of her testimony favorable to defendants, plaintiff seeks to elicit admissions that she made statements to plaintiff's counsel along the nature of the one she stated she made to the bystander but still more favorable to plaintiff. Such sought admissions were in the nature of affecting her credibility and not evidence of the physical fact. If it affected her credibility, it would affect her testimony favorable to the defendants. In the sense that it affected adversely her testimony as to the physical situation, it would affect the defendant lumber company's case even though it did not sponsor her, because it would leave doubt upon the reliability of testimony which was favorable to the lumber company. In this sense the lumber company was bound by the statements, if any, which affected her credibility. In no sense could the statements made to plaintiff's counsel be evidence of the facts they purported to state. The instruction should have been along that line and not as given.

If a witness for the city testifies to a physical fact which tends adversely against the city and on cross-examination matters are brought out which tend to accentuate that fact and modify it to still further be adverse, it is hardly possible to insulate the lumber company from the effects of such testimony. But in the instruction, the words "to any other person" were used. This would mean that the statement to Johnson made by the witness on the afternoon of March 18th would not bind the lumber company. If it was admitted without objection and was material, although incompetent, to show the position of the doubled portion of the fence, it might throw light on the physical situation which must affect the lumber company. The lumber company would be permitted to cross-examine her, which in fact it did attempt to do, but was stopped by the court on the ground that it had no right to cross-examine. No cross-assignment of this ruling as error was

made. Therefore, it is not before us. But the instruction in stating to the jury that the lumber company was not bound by such testimony, which tended to throw light on the physical situation as long as it remained unchallenged by objection or motion to strike, was erroneous. But from the nature of the jury's verdict this instruction could not have been prejudicial. If Mrs. Frederickson's statement to Johnson, from which it might be inferred that Mrs. Frederickson really observed the fence as a menace to stockings and therefore to passersby wearing the stockings (if it can be given that interpretation rather than an interpretation which intimated Mrs. Frederickson's opinion regarding the fence as a hazard), weighed with the jury, it must have weighed in the matter of determining the liability of the city, since the jury was not by the instruction prevented from taking it into consideration as far as the city was concerned. Yet the jury exonerates the city from liability. It must be assumed, therefore, that had the instruction not been given, the verdict in regard to the lumber company would have been exactly the same and that the jury, if it obeyed the instruction, would have come to the same conclusion if the instruction had not been given. Any one familiar with many juries' actual treatment or lack of treatment of the formal written instructions labors under no delusion regarding their efficacy with the jury. What happens in practice, as compared to the theory of the function of written instructions, is one of the travesties of our jury procedure. But this court must, of course, proceed always in sublime ignorance of that fact and on the theory that every written instruction is carefully studied and followed and articulated with other instructions by the jury, and hence, if erroneous, prima facie presumed to be prejudicial. In reference to this instruction, that prima facie presumption has been overcome by the action of the jury in regard to the city.

The plaintiff, by assignments Nos. 14 and 15, assigns error in the ruling of the court refusing a new trial on the

ground of newly discovered evidence, a showing in regard to which was presented by affidavits. There were counter affidavits. A new trial was also asked on the ground that one of the jurors was at the time of his examination indebted to the city for light when in fact he disclaimed any indebtedness. We first take up the matter of the affidavits. As to Winborg's affidavit that about 6 o'clock p. m. on March 18th he saw the wire protruding four or five inches over the pavement, there is a counter affidavit that he offered to testify for the lumber company for $25. Hence the court was justified in rejecting this testimony as being very unlikely to bring about any different result. Jesse Davidson, when the tree "was being worked upon by certain men," saw "the wire *within* one foot of the paved portion." The time is indefinite. The evidence would be of use only in showing variations of the position of the wire. The real issue is as to the position of the wire at 11:30 p. m. on March 18th.

No reason is given why Lavine Jacobsen's testimony should not have been had at the trial. He helped render assistance to the unconscious plaintiff and found his leg engaged with the wire. Clyde Jacobsen's evidence would throw some light on the way the wire lay on the used part of the sidewalk, but at what particular time the affidavit does not say. It would only be cumulative. However, in a case where there is so much variation in testimony, the observations of more witnesses might be more than merely cumulative. These very affidavits seem to fairly well establish the fact that the position of this wire varied. In fact, as one peruses the evidence, he becomes more convinced of the fact that this is the reason for much of the apparently conflicting testimony. Sometimes the wire may have been on the paved portion and sometimes not. Perhaps pedestrians kicked it back. The two affidavits of H. W. Jeppson and Douna Lundberg reveal testimony which the plaintiff should have the benefit of. Miss Lundberg on the evening of March 18th, the night of the accident, while walking on the paved portion, tripped on the wire and lost her

balance. Jeppson on March 7th pushed up the wire which was projecting 18 inches on the pavement and laid it clear of the pavement and then notified Mr. Nyman. Nyman denies that Jeppson talked with him, but the jury should be allowed to choose whom to believe. In a case such as this where the facts are to be proved by the observations of a number of witnesses, the verdict cannot be lightly set aside to permit more witnesses to testify, for new witnesses might continue to be discovered over a long period of time. But each case must rest on its own circumstances. In this case, two witnesses—the plaintiff and one Lundberg—testified positively that they were walking on the pavement at the time of tripping. If we add what Lavine Jacobsen would apparently testify to, there seems to be very little doubt but that plaintiff's foot was caught in the wire and he was seriously injured. It would appear that the accident was easily avoidable had the fence been doubled on the lot rather than the street side of the fence or perhaps by not leaving it doubled for several weeks. The only evidence in rebuttal of plaintiff's and Lundberg's evidence as to the position of the wire at 11:30 p. m. was the inference based on negative evidence that Holden *did not see* the wire on the pavement at 9:30 although he says he noticed that it was not there because he almost stumbled over it. We have, as previously stated, some doubt whether Holden's evidence presented a basis for a legitimate inference but gave the respondents the benefit of this doubt after going into the question at considerable length. On this slim rebuttal alone the conflict as to the vital issue of the position of the wire at 11:30 went to the jury. The evidence and these additional affidavits lend more weight than ever to the theory that the position of the wire changed from time to time either by persons displacing it or by the play of natural forces. This makes the inference from Holden's testimony more tenuous. If Miss Lundberg testifies as stated in her affidavit, it will throw a light on the case which heretofore did not play upon it. Jeppson's testimony would be quite positive of the ability of the loose

fence end to extend onto the pavement. Where disinterested testimony on the vital point in a case is very scant, newly discovered testimony on that point appearing from affidavits in support of the motion for a new trial to be apparently reliable, when it appears that the movant for the new trial was not guilty of indiligence in failing to obtain the witness for the trial, and that there is no element of holding such witness in reserve for purposes of obtaining a new trial— generally picturesquely denominated in slang phraseology as "an ace in the hole"—and it appears likely that such evidence would change the result, a new trial should be granted. While the granting or refusing of the motion lies in the sound discretion of the court, where there is grave suspicion that justice may have miscarried because of the lack of enlightenment on a vital point which new evidence will apparently supply, and the other elements attendant on obtaining a new trial on the ground of newly discovered evidence are present, it would be an abuse of sound discretion not to grant the same. If we take the deductions which respondent lumber company lays down on page 38 of its brief as the criteria which must be present as controlling the granting or refusal of a new trial, we believe this case will furnish the requirements. Respondent says:

"It is only under very special circumstances, because of the quality or type of proposed evidence and where it *makes clear a fact which was formerly in doubt* that new trials are granted to allow the defeated party to add cumulative evidence, newly discovered, and then only where there is a clear probability that the result of a new trial will be different." (Italics supplied.)

The present motion for a new trial furnished such a case.

We will not consider the failure of the court to grant a new trial on the ground that one of the jurors mistakenly said he was not indebted to the city. Most veniremen would fail to recollect or consider their monthly light bill as an indebtedness meant by the question. Since a new trial must be granted, the court may be required to select veniremen who live in the county and have no creditor and debtor re-

lationship; otherwise it might be very difficult to get a jury and this will avoid our having to determine when the indebtedness for light arose, whether from day to day or when the bill was rendered. The matter is trivial and seems not to have in any way prejudiced plaintiff, although technically he may be correct in asserting that the juror gave false answer—albeit unintentionally. *State* v. *Lanos*, 63 Utah 151, 223 P. 1065. We refrain from deciding that question.

The judgment of the lower court is reversed, and the cause is remanded to the district court of Cache county for a new trial. Costs to appellant.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON and MOFFAT, JJ., concur.