## McCOLLUM v. CLOTHIER.

No. 7721.  Decided March 4, 1952.  (241 P. 2d 468.)

See 71 C. J., Work and Labor, sec. 119. Implied contract, recovery upon. 12 Am. Jur., Contracts, sec. 6.

*J. Grant Iverson, Jack Fairclough,* Salt Lake City, for appellant.

*Richard L. Stine, Clyde C. Patterson,* Ogden, for respondent.

CROCKETT, Justice.

Plaintiff recovered a judgment on quantum meruit for services rendered and travel expenses incurred in securing buyers and bidders on certain machinery and equipment which was sold for defendant's benefit at a sheriff's sale after he had foreclosed a mortgage.

Defendant assails the judgment on two main grounds: First, that the evidence does not sustain it; and second, that he was misled into not presenting all of his evidence when the trial court first indicated that he was going to rule for the defendant but later changed his mind.

As to the first point: The plaintiff having prevailed, he is entitled to the benefit of the evidence viewed in the light most favorable to him, together with every inference and intendment fairly and reasonably arising therefrom.

Plaintiff makes no contention for an express contract but asserts that he rendered services for the defendant under such circumstances that defendant is obligated under implied contract to pay for them. Defendant maintains to the contrary, that the plaintiff's activities were officious, and without any promise either express or implied that defendant would pay therefore.

The material facts may be summarized as follows: Defendant, Dr. Clothier, held a mortgage upon certain real property, machinery and equipment of the Kiest Beet Harvester Company of Hooper, Utah, which company went into bankruptcy in May, 1949. Defendant instituted foreclosure proceedings and procured judgment. Before the sheriff's sale was had, J. Grant Iverson who was acting as attorney for the defendant ,talked to the trustee in bankruptcy about the plaintiff McCollum who had been assisting the trustee in bankruptcy during the time she was in control of the property and had been helping in the sale of some of the machinery and equipment. Upon learn-

ing about the plaintiff's work in that regard, he inquired of the trustee as to plaintiff's trustworthiness and where he could be found; then contacted the plaintiff. At his request, plaintiff went to the premises and there met Mr. Iverson and Henrietta McGlone, Dr. Clothier's Idaho attorney. Plaintiff aided then in checking and inventorying the property. He also discussed with them the fact that he had interested some persons in buying it. He was told by Mr. Iverson to continue to line up prospective buyers for the machinery and keep those he had previously talked to informed as to when the sale would take place. Plaintiff's evidence is further that a key to the premises was given him which he immediately turned over to the caretaker, Mr. Floyd Simpson, who thereafter opened the premises for the plaintiff whenever he had a prospect to show the equipment to; that he continued to actively seek for buyers interested in purchasing the machinery; that he made several trips to Salt Lake City and Pocatello, Idaho, either in direct response to the defendant's or his agent's request, or on matters necessary to the successful completion of the work he was doing for the defendant.

It is undisputed that he talked and made reports to both Mr. Iverson and Dr. Clothier concerning his activities although the exact substance of the conversations is controverted. Thus, both the defendant and his attorney and agent were aware of the plaintiff's efforts in lining up buyers for the purpose of securing higher prices for this equipment which would be for the benefit of the defendant. The fact is that the plaintiff's work did react to the benefit of the defendant; some of the buyers at the sale were people whom plaintiff had contacted and interested in the property; they were prepared to pay more than the inventory prices for the machinery and the defendant realized more money than had been anticipated from the sale.

The question of moment, then, is as to the authorization of this work. The rule applicable to the situation is contained in the Restatement of Agency,

Vol. 2, Sec. 441;

"Except where the relationship of the parties, the triviality of the services, or other circumstances indicate that the parties have agreed otherwise, it is inferred that one who requests or permits another to perform services for him as his agent promises to pay for them."

See also *In re Stoll's Estate*, 188 Ore. 682, 214 P. 345, 217 P. 2d 595; *Fancher* v. *Brunger*, 94 Cal. App. 2d 727, 211 P. 2d 633; *Miller* v. *Stevens*, 224 Mich. 626, 195 N. W. 481; *Gleason* v. *Salt Lake City*, 94 Utah 1, 74 P. 2d 1225; 58 Am. Jur. Work & Labor, Sec. 4, p. 512; 17 C. J. S., Contracts, § 4, p. 317 et seq.

It is appreciated that this rule should not be applied to bind one under implied contract who merely permits services to be rendered him, or accept benefits from another, under such circumstances that he may reasonably assume they are given gratuitously. The law should not require everyone to keep on guard against such possibilities by warning persons offering services that no pay is to be expected. It is, therefore, essential that the court should exercise caution in imposing the obligations of implied contract, as contrasted to express contract, where the parties have actually defined and agreed to the terms they are to be found by. With such caution in mind, the test for the court to apply was: Under all the evidence, were the circumstances such that the plaintiff could reasonably assume he was to be paid and that the defendant should have reasonably expected to pay for such services. Here, the fact that the plaintiff had been working previously for the trustee in a similar capacity, for which he had been paid, coupled with the request made by the defendant's attorney and agent to continue the work, and the knowledge of the defendant himself that the work was being done, are all factors which the trial judge could take into consideration in applying the above rule. We conclude that the evidence is sufficient to support these findings of the court that there was an implied contract to pay for the reasonable value of the plaintiff's services.

A somewhat unusual question is presented by defendant's second attack upon the judgment. The trial was held on March 9, 1951. At the conclusion of the evidence the court stated that it was his opinion that the plaintiff had failed to make a case. Accordingly, proposed findings, conclusions and judgment reflecting this decision were prepared by counsel for the defendant. However, before these were signed, the court advised counsel that he had concluded that he was in error and that the plaintiff was entitled to an award. Both counsel attended a further hearing before the court on April 16, 1951, at which time the court reversed his former position and told them that he would rule for the plaintiff. Defendant's counsel then indicated that he thought the court had not recalled the testimony correctly. Pursuant to agreement of the parties and the court, a part of plaintiff's testimony was excerpted for the use of the court. He thereafter entered a judgment for the plaintiff.

The defendant's present contention is that the statements of Judge Hendricks that he thought judgment should be for the defendant misled him so that he did not present the testimony of the caretaker, Floyd Simpson, which he thinks might have been controlling in the case. The occurrence with respect to Simpson's testimony was as follows:

Mr. Iverson:

"We rest your Honor unless you feel it necessary that we have the testimony of Mr. Floyd Simpson who was the caretaker out at the plant."

The Court:

"I don't think it necessary to go out and get his testimony at his home."

At the later hearing after the court had indicated that he would enter judgment for the plaintiff, the following occurred:

Mr. Iverson:

"If it please the court, I think the evidence is that he [McCollum] did not hold the keys. The evidence that I would have adduced, if your Honor will recall at the conclusion of the case I suggested that the matter be continued until I could take the testimony of the caretaker of the building, at which time your Honor indicated that you did not care to take his testimony."

The Court:

"Well if you still want to put that evidence on, then we will continue it until then."

Mr. Iverson:

"The difficulty is that the man has died in the meantime, * * *."

So far as the record discloses, the above matter concerning the keys is the only indication defendant's counsel made to the trial court as to the testimony he would have adduced from Simpson. Plaintiff however never did contend that he personally held the keys, and it is apparent from the court's subsequent statement that the holding the keys was not the basis of his decision but the facts that the plaintiff continued to contact people, show them machinery, take them to the premises, and that such work was done at the suggestion and with the knowledge of the defendant and his agent.

Defendant now contends that Simpson would have testified that plaintiff took no one to the plant between the time he finished selling machinery for the trustee and the time when plaintiff was in possession of the plant using certain facilities for his own purposes with permission of the defendant, which would cover the general period of the plaintiff's claimed employment by the defendant. This would have been in direct conflict with plaintiff's testimony that he had on several occasions contacted Simpson and had him open the premises so that he could show machinery and equipment to prospective purchares.

It was undoubtedly unwise of the trial court to express an opinion concerning the determination of the issues before he had thoroughly analyzed the evidence and arrived at a definite and final conclusion. It may have misled counsel and dissuaded him from presenting other evidence which would have proved helpful in arriving at the solution to the controversy. However, it is the responsibility of counsel and not the court, to decide whether a satisfactory case has been made from counsel's viewpoint. He should not seek to shift this responsibility by asking the court if he wants to hear additional evidence, and then if the judgment goes adverse to him be heard to say that he was misled into not presenting his evidence. It is only fair to state that the court did nothing to prevent the defendant from presenting this testimony at the trial if he had so desired and at the subsequent hearing he offered to continue the matter for the purpose of taking Simpson's testimony. That was all he could do at that time. The fact that Simpson had died meanwhile is a misfortune for which neither the court nor the parties can be blamed.

Counsel for defendant cites us to the case of *Harrison* v. *Harrison,* 48 Kan. 443, 29 P. 572, as an authority supporting his view of this case that, having been misled by the court into failing to put on all his evidence, he is now entitled to a reversal. That case is distinguishable in several respects from the instant one. There, the court on its own initiative, interrupted the defendant's presentation of evidence and stated that he was ready to decide the case for the defendant; that he did not think additional testimony would affect his decision but would hear anything of a different nature from that already offered. To have proceeded might well have risked censure to counsel by the court. Under those circumstances, the court held that where the evidence proponderated heavily in favor of the defendant, and the decision was against him, the remarks of the court had tended to mislead him into not producing his evidence and had thus prevented him from

having a fair trial. But, here we are not concerned with a situation where a judge initiated any act which might actively mislead counsel.

Another important difference is that in the *Harrison* case the matter was remanded for a new trial so that all of the evidence could be presented, and presumably the witness, or witnesses, who would have been called to testify in the first trial could be called in the new trial, whereas, in the present case, the testimony of Simpson is gone forever because he is deceased and no steps were ever taken to perpetuate his testimony. Since the plaintiff's evidence is sufficient to sustain the judgment, it is clear that we could not enter a judgment "no cause of action." If the case were reversed, it could only be for a new trial. Therefore, we are faced with the anomalous situation of the defendant requesting a new trial upon evidence which would apparently be the same as produced at the first trial.

The fact that Simpson's testimony was not presented is not blamable on the court and is not imputable to the plaintiff who did nothing to mislead the defendant with respect to the presentation of his evidence. The plaintiff should not be required to undergo a second ■ trial on the same evidence merely because the defendant elected not to present a part of his evidence. This is even more so when the additional evidence would not be available for another trial and the only result that could be accomplished would be to give the defendant the advantage of having another judge pass on the same evidence. In requesting the new trial on that basis, the defendant is tacitly suggesting that we recognize his contention that another judge might find differently on the same evidence. Where the evidence sustains the judgment, it would be an arbitrary invasion of the trial court's prerogatives to reverse the case and grant a new trial for any such purpose.

The fact that the trial court changed his mind and entered a judgment contrary to his orally announced decision at the time the case was submitted, cannot be the basis for over-turning the judgment. The only judgment that can be given effect is the one entered in accordance with law.

"* * * no antecedent expressions of the judge can in any restrict his absolute power to declare his final conclusion, in the only manner authorized by law, to wit, by filing his 'decision' (findings of fact and conclusions of law) * * *." *Phillips* v. *Hooper*, 43 Cal. App. 2d 467, 111 P. 2d 22, 23.

Oral statements of opinion by the trial court inconsistent with the findings and conclusions ultimately rendered do not affect the final judgment. *Lord* v. *Katz*, 54 Cal. App. 2d 363, 128 P. 2d 907. See also: *Fisk* v. *Casey*, 119 Cal. 643, 51 P. 1077; *Boas* v. *Bank of America, Nat. Trust & Savings Ass'n*, 51 Cal. App. 2d 592, 125 P. 2d 620; *Dell* v. *Hjorth*, 51 Cal. App. 2d 576, 125 P. 2d 505; and *Wilcox* v. *Sway*, 69 Cal. App. 2d 560, 160 P. 2d 154.

Judgment affirmed. Costs to respondent.

WADE and McDONOUGH, JJ., concur.

WOLFE, Chief Justice (concurring in the result).

I concur in the holding that there is competent evidence to support the judgment; that a statement by the court preliminary to judgment filed by him that he favors or leans toward one of the parties is an utterance only and not a judgment; that since the actual judgment is supported by evidence the case cannot now be remanded for the purpose of ascertaining what another judge would determine or how he would hold; that reversal could not undo what has been done because of the untimely and unfortunate death of a material witness.

Speaking on the merits of the case, it appears to me that one may find himself in this jurisdiction saddled with an agent and an implied contract to pay for his services on

slim evidence. It would seem that the putative agent might have some responsibility to make certain that he was an agent before he undertook the services. All of us are familiar in life with instances where a seeming volunteer ingratiates himself into the confidence of another only to be later revealed as a self-seeker. But I cannot say under the evidence, as related by Mr. Justice CROCKETT, that there was not in this case the relation of principal and agent between Dr. Clothier and Mr. Collum and that under such inferred agential relationship the plaintiff did not perform services for the defendant, assuming Mr. Iverson, attorney for the defendant, had authority to initiate such relationship between plaintiff and defendant. It would have obviated all doubt if the plaintiff had, at the beginning, ascertained whether he was on a commission or quantum meruit basis or on an agential basis at all. He may have realized that the certainty called for by such overtures would have ended any chance to recover for his services as a putative agent and preferred to take the gamble which events proved to have been a paying one. I am, therefore, in accord with the statement in the opinion that.

"The law should not require everyone to keep on guard against such possibilities [the possibility that the services were given gratuitously or on the contingency that the services were to be paid for only on the basis of their success and so measured] by warning persons offering services that no pay is to be expected."

And also with the statement that,

"It is, therefore, essential that the court should exercise caution in imposing the obligations of implied contract, as contrasted to express contract, where the parties have actually defined and agreed to the terms they are to be bound by."

My comment on this wise statement is that it appears to me that our courts have merely paid lip service to it or ignored it altogether. It is too easy in this state for one to surprisingly find himself a promisor under an implied contract.

As to the second phase of the case:

I agree that it was and is unwise for a court to express an opinion as to his conclusion on the issues before he has "analyzed the evidence and arrived at a definite and final conclusion" unless he makes it clear that his expressions are tentative only. Of course, circumstances play an important part in any rule. A wise judge works closely with both counsel in the conduct of the case. And counsel should and usually do try to cooperate with the court to the end of trying the case expeditiously and wisely. From my experience on the trial bench, I think that there are times when the judge may justifiably take a hand in the proceedings in a non-jury case or in the absence of the jury, and timely indicate his doubts and even dissatisfaction with the evidence. I see no reason why a trial judge should be little more than part of the furniture and perhaps with little adornment value at that.

Nor do I see why counsel should not at proper times, especially before the case is concluded, inquire of the court as to whether he is in doubt or unsatisfied as to any phase of the case. Of course, this presumes that the court is judicial and counsel are cooperative and that both the court and counsel are harmoniously working together for the expedition of justice or at least for a fair outcome of the case.

In this case, I think that counsel's suggestion that no further evidence would be presented unless the court desired to hear Simpson was advanced in a spirit of cooperation and not for the purpose of eliciting an utterance from the court as to his state of mind; also that the response by the court to the suggestion was well meant but unwise and hardly a necessary response to the suggestion. A remark, if any, by the judge should have expressed a tentative doubt as to the case made by the plaintiff but warned counsel that he had yet to examine the whole testimony and that the latter should be guided as to calling Simpson or taking his deposition purely by his (counsel's) judgment.

However, if the court was apprised of Simpson's impaired state of health and weakened condition, he may have justified in trying to save him the strain of testifying. So much depends on the circumstances. I think this case points up lessons for both court and counsel, wherefore my rather extended observation: First, that the court and counsel cooperate harmoniously in the expedition of trials. Second, that judicial conduct requires that the judge make no untimely pronouncements as to the state of his mind in reference to conclusions on the issues except as cooperation and his need for further enlightenment on the facts seemingly require him to divulge his tentative conclusions and then only with a warning that they are tentative so that counsel are not to be misled. Third, that counsel only seek an indication of the court's tentative state of mind in a bona fide attempt to expedite the trial and then only with the knowledge that any response elicited from the court cannot be taken as an assurance of victory or defeat and that it is but an interlocutory utterance from the bench.

It has seemed to me that the main opinion, even taking into account its admonitionary caution to the judge, overemphasized the responsibility of the attorney for his having invited the judge to mislead him. I do not quite see it in that light. The judge had control of his own response. As an aside, it should be noted that Mr. Iverson's allusion to Mr. Simpson's having the key was meant not to express the thought that Mr. Simpson would, if called, testify only as to having the key, but was symbolic of all the facts Mr. Simpson knew because of his having the key. That the main opinion recognizes that this evidence would have been valuable to the defendant appears from the statement in the opinion that

"Defendant now contends that Simpson would have testified that plaintiff took no one to the plant"

when he claimed to be working for defendant. Of course, the mere fact that Simpson had the key would not have

helped. What would naturally be read into Mr. Iverson's suggestion that Simpson's deposition be obtained was that Simpson knew who plaintiff had brought to the plant because no one could gain access to the building without the key and that Simpson, because he had the key, would be able to testify as to some of the activities or lack of activities of the plaintiff. This might or might not have made some difference in the amount of the judgment which was for some unrevealed reason hiked by the judge from $250 to $652.80 after the transcript had been procured by the defendant.

It is only in a case like this where some event intervenes which causes the misleading of counsel to be to his irreparable damage when the full harm which may flow from the court's untimely utterance is made dramatically manifest. But due to Mr. Simpson's death, I do not see how it can be remedied by reversal.

HENRIOD, J., having disqualified himself, did not participate.