493 P.2d 1283

EWELL AND SON, INC., a corporation, Plaintiff and Respondent,

v.

SALT LAKE CITY CORPORATION, a corporation, Defendant and Respondent,

Denver and Rio Grande Western Railroad Company, a corporation, Defendant and Appellant,

Union Pacific Railroad Company, a corporation, Defendant and Appellant.

No. 12166.

Supreme Court of Utah.

Feb. 10, 1972.

Van Cott, Bagley, Cornwall, & McCarthy, Thomas M. Burton, Salt Lake City, for Denver and Rio Grande Western Ry. Co.

A. U. Miner, D. A. Bybee, N. W. Kettner, S. A. Goodsell, J. C. Williams, Salt Lake City, for Union Pacific RR.

Worsley, Snow & Christensen, Reed L. Martineau, Salt Lake City, for Ewell & Son, Inc.

Jack L. Crellin, City Atty., Salt Lake City, for Salt Lake City Corp.

CROCKETT, Justice.

Plaintiff Ewell and Son, Inc., contractor, sued to recover for money claimed to be due beyond the amount stated in the basic contract in connection with the installation of a sewer line on west Ninth South Street in Salt Lake City which involved crossing under the tracks of the defendant railroad companies Union Pacific and D & RGW. Upon a trial to a jury verdicts were rendered in favor of the defendant Salt Lake City, but against the named railroads Union Pacific for $6,508.42 and against D & RGW for $14,101.83. The railroads appeal contending upon several grounds discussed below that there is no proper basis for charging the amounts stated against them.

The jury having found no liability against Salt Lake City, and no appeal having been taken therefrom, the issues between it and the plaintiff are thus laid at rest. Our concern is the contractual obligations of the Railroads to the plaintiff; and no advantage can inure to them in their attempt to inject into this proceeding questions concerning any irregularity or impropriety which may or may not have existed in the procedures relating to the awarding of the contract to plaintiff by the City.

The City had advised the Railroads by letter on July 26, 1965, of the proposed construction; and by another September 21, 1965, that inasmuch as they were operating over the City's streets by franchise, they would be responsible for protecting their tracks; and that the City would not be responsible for additional expenses to the

contractor resulting from their presence in the street. This was reiterated in conversations between representatives of the Railroads and of the City the day following the awarding of the contract to the plaintiff. The next day, October 22, there was a meeting of the plaintiff, and representatives of the Railroads, and the City, at which problems relating to the running of the sewer under the tracks were discussed. It is admittedly somewhat strange that whatever transpired at that meeting was not reduced to writing. Nevertheless, it is of importance in this case because it forms the foundation for the claims upon which the plaintiff brought this suit.

■ In preface to discussion of the various contentions of the appellant Railroads it should be said that they have indulged in the euphoric fallacy so common to losing litigants: a blithe persistence in assuming that the facts are as they desire to see them, rather than as they were seen by the jury. It therefore seems necessary to reiterate the basic rule of review: that we are obliged to survey the evidence, and all reasonable inferences that could fairly be drawn therefrom in the light favorable to the verdict and judgment.[1]

At the October 22 meeting Ewell discussed with the City Engineers and the Railroads' office engineers the comparative costs of the alternative methods of "open cutting" under the tracks as opposed to "jacking and pinning" under them. As part of this, Ewell was asked by the Railroads how much more it would cost to open cut, to avoid the greater expense of the jacking and pinning method, assuming a distance of 22 feet for each set of tracks and limiting the crossing time at each set of tracks to ten hours or less. In response Ewell quoted the sum of $34.21 per foot. It is not shown that the defendants either expressly objected to or accepted that proposal. But the plaintiff did proceed and complete the project.

Defendants make the argument that the entire sewer installation project including all of the plaintiff's rights and duties was by a comprehensive contract with the City; that the defendants are third-party beneficiaries thereof; and that consequently the plaintiff cannot go beyond that contract and charge defendant Railroads separately for expenses incurred on account of going under their tracks. They also urge that for the same reason: that the contract was complete in and of itself, the court committed prejudicial error in admitting parol and self-serving evidence concerning the October 22 meeting and other matters relating to the contract; and that there has not been shown any express or implied agreement that they would compensate plaintiff Ewell as he claims.

1. Christensen v. Christensen, 9 Utah 2d 102, 339 P.2d 101.

■ In regard to the contentions just stated it is first to be noted that what the defendant Railroads call the comprehensive agreement was between the City and plaintiff Ewell; and that the Railroads were not parties to it. Even though the contract fixed the rights between the plaintiff and the City, there is no reason whatsoever why the plaintiff and the Railroads could not enter into collateral contracts concerning their responsibilities; and this could be either by express or implied agreement. The latter depends upon what was said and done between the parties. We have previously stated in the case of McCollum v. Clothier [2] the test to be applied is:

. . . Under all the evidence, were the circumstances such that the plaintiff could reasonably assume he was to be paid and that the defendant should have reasonably expected to pay for such services. . . .

■ Upon the evidence, viewed in the light favorable to the plaintiff, the jury could have looked at the facts in this manner: after the Railroads had been advised by the City that they would be responsible for additional expense because of the presence of their tracks; and their representatives had asked for and were given figures by the plaintiff concerning the additional expense, if they had had any objection to the plaintiff's figures, they should have so stated; and that by remaining silent in full awareness that the plaintiff was proceeding with the project they should be deemed to have accepted the obligation to compensate him in accordance with the figures he had given them.[3]

■ In regard to the claim of error in admitting evidence extraneous to the contract between plaintiff and the City: it is elementary that whenever there is uncertainty or incompleteness with respect to what the rights and duties under a contract are, it is permissible to receive collateral evidence to determine those matters.[4] There is, however, a specific assignment of error with respect to one part of the testimony just referred to that deserves comment: In regard to the meeting of October 22 the City Engineer was permited to testify, inter alia, that he "understood the Railroads and Ewell to have an understanding or that they soon would have one." The propriety of this testimony admittedly presents a borderline question for reasons upon which we do not extenuate except to make these observations: The allowance of the City Engineer's testimony in that form was probably not the most artful manner of eliciting his knowledge and observations as to what went on at the meeting.

---

2. 121 Utah 311, 241 P.2d 468.

3. See Williston on Contracts, Rev.Ed., Vol. 1, p. 228.

4. Ephraim Theatre v. Hawk, 7 Utah 2d 163, 321 P.2d 221.

However, he was a professional man, interested in the same subject matter on behalf of the City, who was participating in the discussion. Additionally, he was subject to whatever cross-examination the defendants desired. Whether the allowance of such testimony, which we have characterized as borderline, is unfair and harmful depends upon the particular circumstances and must necessarily be left largely within the discretion of the trial court.[5] In any event as we see the total situation, we cannot believe that allowing the statement was such an abuse of discretion as to be sufficiently prejudicial to the defendants to warrant a reversal of the case and a remand for a new trial.

■ Appellant D & RGW makes an argument that its office engineer who attended the meeting had no authority to enter into any such agreement with Ewell. We are not concerned with what may have been the actual authority of the defendant's office engineer. It is not disputed that he was employed in that capacity by the Railroad, nor that he was sent to the meeting to participate in the discussion of the problems involved. It is also shown that such engineers did at times negotiate agreements with contractors. Under the facts here disclosed plaintiff Ewell had a right to assume that he was acting for his employer and was not obliged to demand credentials as to his specific authority. It is "well established in the law . . . that a principal cannot escape liability by leaving his business in the hands of agents, then denying their authority to act for him."[6] The jury was properly instructed on the subject and there is a sound basis for holding that the engineer had ostensible authority to represent his employer.

There is also controversy over the correctness of the amount charged the D & RGW on a particular phase of the work. When plaintiff came to its main-line tracks on Fourth West there was some indecision on the part of the Railroad as to whether the plaintiff should use the open-cut or the jacking method. D & RGW tendered Ewell a contract proposing 40 feet of jacking. He refused to accept because he thought that if that method were used it would require at least 90 feet. After some discussion the matter was resolved by a written agreement which provided that the length was "to be determined by the Railroad's division engineer or his authorized representative." That contract also stated that "this contract may be terminated by the Railroad upon one (1) day's written notice, in which event the Railroad shall not be liable to contractor beyond payment for

5. Joseph v. W. H. Groves Latter Day Saints Hospital, 7 Utah 2d 39, 318 P.2d 330 (1957).

6. O. S. Stapley Co. v. Logan, 6 Ariz.App. 269, 431 P.2d 910 (1967); 3 Am.Jur.2d Agency 74.

work performed and material furnished to effective date of termination."

■ After commencing the jacking method operation, plaintiff discovered, on about the second or third day, that an underground storm sewer crossed Ninth South Street diagonally instead of parallel to the tracks, as shown by the plat. He says this made open-cutting impractical and made the use of the jacking method under the remainder of the D & RGW tracks a necessity. D & RGW was advised of this but nevertheless gave plaintiff written notice to stop the jacking method after 40 feet. However, plaintiff apparently hurried up and completed the job, total distance 100 feet, within the 24-hour notice period. Of this the City paid for 30 feet and the Railroad has offered to pay for the 40 feet, leaving a controversy over the remaining 30 feet. The plaintiff's evidence as to the facts just delineated justifies the finding of the jury for the plaintiff on this issue.

■ Defendant Railroads each make an attack upon the portion of damages assessed against them for plaintiff's claim of "unreasonable delay" arising from their conduct including indecision as to methods of procedure. Two observations are to be made: First, the clause in the contract that the contractor (plaintiff) will "not be enti-tled to any claim for damage on account of hindrance or delay for any cause whatso-ever" protects only the City, the other party to the contract, and not the Railroads who were not parties thereto. Second, the Rail-roads' reasons seeking to justify their con-duct are a *good jury argument*. But this is another matter upon which reasonable minds might differ and under the tradi-tional rule the jury verdict must stand.

■ A number of contentions are made as to errors in regard to the nu-merous requests for instructions and those given by the trial court. Rather than to analyze them in detail, we think it advisable in the interest of brevity to treat them by restating certain governing principles. As the trial court correctly informed the jury, no particular instruction or part thereof should be picked out and considered sep-arately. They should all be considered to-gether.[7] If when so considered they give the jury a fair understanding of the issues of fact to be determined and the law appli-cable thereto their purpose is accomplished. We believe it was in the instant case; and there is therefore no justification for up-setting the verdict and judgment merely be-cause plausible arguments as to error can be made by singling out certain portions of the instructions.

■ Neither are we convinced that the trial court abused its discretion in sub-

---

7. Morgan v. Mammoth Min. Co., 26 Utah 174, 72 P. 688; Startin v. Madsen, 120 Utah 631, 237 P.2d 834.

mitting the case to the jury upon general verdicts, and in not using special interrogatories or special verdicts as requested by defendants. As we have stated before, this ". . . is largely within the discretion of the trial court . . . and unless a clear abuse of discretion is shown . . . the refusal to submit such interrogatories is not reversible on appeal." [8]

There is another point of minor import, but perhaps worthy of comment, defendants contend that because Section 54–4–15, U.C.A.1953, vests in the Public Service Commission the regulation of grade crossings, this whole matter should have been handled by that Commission, and that consequently the district court has no jurisdiction thereof. The controversy here is not concerning the regulation of grade crossings as contemplated in the section referred to. It is a suit based upon a claim by the plaintiff for work performed for the defendants which was properly brought in the court of general jurisdiction which has authority to adjudicate such controversies.

There is a truism which can be safely indulged: in any lawsuit such as this of several days' duration, counsel can usually find something to complain about. Nevertheless, when the parties have had a full and fair opportunity to present their case, and the jury has rendered its verdict and the trial court has entered its judgment thereon, all presumptions favor their validity; and the burden is upon the appellant as the attacker to show some substantial basis for upsetting them. It is well established by our Rules of Procedure,[9] derived from statute,[10] and by our decisional law [11] that we will not reverse because of mere error, but only if it is substantial and prejudicial in the sense that there is a reasonable likelihood that unfairness or injustice has resulted. We are not persuaded that any such circumstance exists here. Consequently there is no sufficient basis to justify disturbing the verdicts and judgment.

Affirmed. Costs to plaintiff (respondent).

TUCKETT and ELLETT, JJ., concur.

HENRIOD, Justice (dissenting).

I respectfully dissent, for the following reasons:

The only issue here is whether factually there was an enforceable oral contract be-

8. Berg v. Otis Elevator Company, 64 Utah 518, 231 P. 832.

9. Rule 61, U.R.C.P.

10. Sec. 104–39–3, U.C.A.1943, repealed by Ch. 58, Sec. 3, S.L.U.1951, upon adoption of new Utah Rules of Civil Procedure.

11. See Uptown Appliance & Radio Co., Inc. v. Flint, et al., 122 Utah 298, 249 P.2d 826; Jensen v. Logan City, et al., 89 Utah 347, 57 P.2d 708.

tween Ewell and the railroads,—the whole thrust of which is that silence here was not golden, but an acceptance of some kind of an offer made by Ewell, resulting in a contract. At best, testimony anent thereto was rather obfuscatory and not of the type required in such cases, as will be demonstrated. None who testified thereto was particeps to such an alleged contract which he simply *thought* to be such, save Ewell, whose testimony, so far as admissibility of evidence is concerned, was the sole basis for the jury's finding that an enforceable contract existed.

The main opinion, at some length, recites the facts that *the City* notified the railroads that they would have to protect the underpinning of their tracks, since *the City* would not be responsible to Ewell for expenses incident to the presence of the tracks, and that this admonition was orally reiterated by employees of *the City*, not parties, *but* only bystanders. I agree heartily with the comment volunteered in the main opinion that "It is admittedly somewhat strange that whatever transpired at the meeting *was not reduced to writing*." It is even stranger that the *only* clear agreement entered into between Ewell and the railroads that could be said was binding, was that between him and the D & RG with respect to the specifications for "jacking and tunneling," *which was in writing*. The main opinion then says that "nevertheless,

it is of importance in this case because *it* (whatever transpired at the meeting, all of which was oral) forms the foundation for the claims upon which the plaintiff brought this suit." It is submitted that nothing said or done, as related above in the forepart of this paragraph, has one whit to do with any contract between Ewell and the railroads.

In the next paragraph of the opinion it states that the "euphoric fallacy" of the losers (the railroads here), in stating facts favorable to their position invokes the rule that we survey the evidence in a light favorable to the verdict. There is no euphony of logic though, when the main opinion, euphoric or not, implies that because of such approach the railroads *must* have contracted with Ewell, and that there *must* have been a contract although the facts so viewed did not come close to a contract under traditional principles relating to that subject.

The next paragraph in the main opinion recites that Ewell discussed with the City and railroad engineers the costs of alternate methods of laying the pipe, in which the main opinion concedes, by its language, that "It is not shown that the defendants either expressly objected to or accepted that proposal." This paragraph of the opinion seems to indicate that there was no meeting of the minds, or manifestation of mu-

tual assent existing between the parties, and it is just as consistent that defendants objected as it is that they accepted anything, and any silence born of such lack of evidence hardly could be used to transmute an acorn into an oak tree.

The next part of the main opinion having to do with a possible contract between Ewell and the railroads contains the rather startling suggestion that in the *conversation* between the City and railroad engineers where Ewell gave some figures concerning additional costs, the fact that the railroads' engineers said nothing, knowing that Ewell was going ahead "with the project," *which he was bound to do anyway under its contract with the City,*—the jury could have found that their failure to say anything resulted in a contract. To say that a contract that must be established by at least some substantial and clear evidence was established by such type of proof based on such nebulous and flatulent evidence as adduced and recanted in the main opinion is not only provocative of flight from the simplest elementary principles of contract, but draws the shades on Williston and Corbin. It is obvious that such tenuous evidence bound no one, and the jury should not have been allowed to speculate on it.

The main opinion sanctions a statement in the conversation made by the city engineer, that "he *understood* the railroads and Ewell to have an understanding *or that they soon would have,*" in support of the decision here affirming a contract. The justification for the admissibility of such cloud-nine testimony was that, though a borderline question (which obviously it was not), the engineer was a professional man, interested in the subject matter, and subject to cross-examination, all of which was within the discretion of the trial court, and which this court thinks wasn't very prejudicial anyway, seems to be a non sequitur so naive as to disembowel the corpus evidentia. This erroneous permissiveness on the part of the trial court is like permitting the fans in the right field bleachers to call the balls and strikes at home plate. The main opinion fails to reveal that not only was the city engineer allowed to testify that he *thought* a couple of *other* people executed a contract,—(particularly where one of them participated therein in deathless silence) and in obvious usurpation of the prerogatives of another profession not his own, but permitted others, in gross, equally to demonstrate their expertise as to the elements requisite to create a contract,—thus compounding the error of the trial court. It appears that the main opinion partakes of the hors d'oeuvres of this case but fails to jawbone the meat of it. It is no answer to say, as does the main opinion, that Ewell had a right to believe an engineer for one

of the railroads which could bind the latter by silence, especially when Ewell's own evidence is based on what a batch of strangers thought was a contract, epitomized by one's less than clear gem to the effect that *he* "understood that the *parties* had an understanding *or that they soon would have.*" Such evidence may not only lead to silence but to an aberration reflecting incompetency to contract. Furthermore, the concessions made by Ewell in his own testimony militates against the existence of a contract. When he was asked about the railroads' representatives' participation in the talkfest, he said that none of them agreed to pay him any money for the footage expense extra in the tunneling process. It is axiomatic that a litigant's chain of testimony is no stronger than its weakest link, and it is no answer to say this positive evidence given by Ewell himself can be substituted by the silence of his adversary.

The balance of the main opinion has to do with matters other than the facts necessary to justify a finding of a parol contract based almost solely on parol evidence. It is submitted that the facts *recited in the main opinion itself*, together with the concessions of Ewell, will not support a contract based on either actual or ostensible authority and that it was reflected by nothing positive, but only by the conjecture that silence breathed life into that which was either not as yet conceived or unenforceably stillborn.

CALLISTER, C. J., concurs in the dissenting opinion of HENRIOD, J.