Robert H. LAMB and Marcia N. Lamb,
his wife, Plaintiffs and Respondents,

v.

Thomas BANGART and Shirley Bangart,
his wife, Defendants and Appellants.

No. 13064.

Supreme Court of Utah.

July 29, 1974.

Robert M. McDonald and W. Robert Wright, Jones, Waldo, Holbrook & Mc-Donough, Salt Lake City, for defendants and appellants.

Clifford L. Ashton and Robert M. Anderson Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, for plaintiffs and respondents.

CALLISTER, Chief Justice:

Plaintiffs initiated this action alleging breach of warranty and fraud on the part of defendants in the sale of certain livestock. After a prolonged trial before a jury, in response to a set of special interrogatories, the jury awarded plaintiffs $60,500 compensatory damages; $10,000 punitive damages; and $20,000 attorney's fees. The trial court rendered judgment thereon, stating that the jury by its verdict had determined that the damages sustained by plaintiffs were caused and induced by the fraud of the defendants. Defendants appeal citing nine points which they urge constitute prejudicial error on the part of the trial court.

The parties executed a written livestock sale agreement on May 27, 1968. Paragraph 1 contains a description of the livestock: (a) A one-fourth interest in a Charolais Bull, known as Fuyard 1st, located at the T. L. Bangard Ranch, Roberts, Montana. (b) Ten purebred Charolais heifers (daughters of the above described bull), which heifers had already been delivered to buyers.[1] (c) One Charolais Bull described as T.L.B. Fuyard 40; this animal is not included in this action. Under paragraph 2 of the livestock agreement, the purchase price of the quarter interest in Fuyard 1st was designated $50,000, and the price of the ten heifers was $25,000. Under the terms of payment, the plaintiffs were not obligated to pay the balance of the purchase price of $30,000 on Fuyard 1st until January 5, 1969; this sum was never paid because of subsequent events. Under paragraph 6, the sellers warranted that all of the animals were breeders. The livestock agreement further recited that

---

1. This description creates an express warranty under 70A-2-313(1)(b), U.C.A.1953, as amended 1965.

the parties would execute contemporaneously with the sale agreement a Joint Ownership Agreement with Keating Ranch, Inc., which also owned an interest in Fuyard 1st. This second agreement reiterated the provision of paragraph 4 of the sale agreement conferring on plaintiffs the right to collect all the semen from the bull until they had 1500 ampules. The Joint Ownership Agreement provided that possession of the bull should be retained by Bangarts at their ranch or such other place as they might determine. Each party was responsible for paying the expense involved in collecting semen from the bull, but Bangarts were to pay the costs of transporting the bull from their ranch to and from Denver (the location of the International Beef Breeders, the facility where the semen was collected).

In plaintiffs' complaint, they alleged that at the time they entered into the livestock agreement defendants misrepresented and fraudulently concealed certain material facts which, if known to plaintiffs, would have caused them to refrain from entering into the transaction. Specifically, defendants concealed from the plaintiffs the fact that Fuyard 1st was not in good physical condition and was not, in fact, a breeder as represented. Furthermore, the ten purebred Charolais heifers sold to plaintiffs pursuant to the agreement were represented to be daughters of Fuyard 1st, when, in fact, they were not, and such fact was known to defendants at the time of execution of the agreement and delivery of the heifers. Plaintiffs claimed that they had been damaged as a direct result of the false and fraudulent misrepresentations in the sum of $10,000. Plaintiffs pleaded for an award of $50,000 punitive damages on the ground that the false and fraudulent misrepresentations of defendants were made wilfully and maliciously. Plaintiffs further pleaded for reasonable attorney's fees as provided in the livestock sale agreement.

The jury in the special verdict found that none of the ten heifers delivered by defendants to plaintiffs was a daughter of Fuyard 1st and that $33,000 would reasonably compensate plaintiffs because the heifers were not Fuyard's daughters. The jury found that Fuyard 1st was not a "breeder" as that term was generally understood in the purebred cattle industry at the time of the written contract in May 1968. The jury found that the sum of $27,500 would compensate plaintiffs for the damages suffered and proximately resulting from the fact that the bull was not a "breeder." The jury found that the defendants or either one of them had made misrepresentations to plaintiffs (a) knowing the same to be false, or (b) that they or either one had insufficient knowledge upon which to base such representations. The jury further found that the defendants or either one wilfully and maliciously made misrepresentations that constituted fraud to plaintiffs.

In reviewing the instant record, this court is obliged to survey the evidence and reasonable inferences that could be drawn therefrom in the light favorable to the verdict and judgment.[2]

Plaintiff, Dr. Lamb is an orthopedic surgeon; both he and his wife had some ranching experience in their youth. They purchased a ranch in Eclectic, Alabama and determined to raise Charolais cattle. The Lambs' first contact with Mr. Bangart was in February, 1968, when they were advised of his expertise in the breeding of Charolais cattle, and they contacted him to inspect some cattle they had arranged to purchase in Illinois. At this time Mr. Bangart advised the Lambs to purchase from him some higher quality purebred Charolais females, which were the offspring of the famous bull, Fuyard 1st, which Bangart owned. While loading the cattle purchased in Illinois, several were sent to the Bangart Ranch upon his agreement that he would accept them as partial

2. Ewell and Son, Inc. v. Salt Lake City Corporation, 27 Utah 2d 188, 192, 493 P.2d 1283 (1972).

payment on the cattle the Lambs would purchase from him. During these negotiations it was agreed that the Bangart cattle could be purchased for $2,500 per head, and a credit of $600 per head would be allowed for the cattle shipped to Bangarts. The original arrangement involved sixteen head but was subsequently reduced to ten.

Lambs' next contact with the Bangarts was in Phoenix, Arizona in the latter part of February, 1968. The parties discussed the importance of the quality of a herd sire. Mr. Bangart discussed his willingness to sell a one-quarter breeding interest in Fuyard 1st. Mr. Bangart indicated that the bull had had trouble with his right hind leg a year or two previously but he had recovered and was in good condition. This representation that the leg had healed and the bull was in good physical condition was repeated on other occasions, and Lambs were not informed of any residual effects of the prior trouble with the leg.

The parties next met in Caldwell, Idaho in March, 1968. At this cattle show, the Lambs observed and decided to purchase from Bangarts a bull called Fuyard 40 for $2,500. The Lambs further indicated their willingness to purchase the breeding interest in Fuyard 1st, if the parties could reach a reasonable agreement.

Dr. Lamb returned to Salt Lake City and Mrs. Lamb remained in Caldwell and then accompanied Bangarts to their ranch in Roberts, Montana. Mrs. Lamb was shown Fuyard 1st in his pen and observed him arise and turn around. When she queried about his walking outside of his pen, she was informed that a bull doesn't need to walk very much; she never had an opportunity to observe his walking. Mrs. Lamb was further shown two pens containing twenty heifers who were represented to be the offspring of Fuyard 1st, and Mr. Bangart informed her that he would select the ten females Lambs were purchasing from this group. Mrs. Lamb testified that the heifers she was shown were uniform in age, height, and size, and resembled each other. Mrs. Lamb accompanied Mr. Bangart in a truck and they drove around his ranch and he indicated cattle, which he represented to be the dams of the heifers in the pens. Mr. Bangart never informed Mrs. Lamb that some of the heifers she had observed came from anywhere other than his ranch.

Later in the day, when Mr. Bangart drove Mrs. Lamb to the airport, he requested a down payment of $20,000 on the interest in Fuyard 1st. She was reluctant since they did not have a written agreement, and she had never conferred with Mr. Keating concerning the proposed arrangement, and he owned the other one-half interest in Fuyard 1st. Mrs. Lamb telephoned her husband and then issued the check, which upon Mr. Bangart's insistence she wrote that it was in payment for Fuyard 1st.

The ten heifers and Fuyard 40 arrived at the Lambs' ranch in Alabama on April 1, 1968, and Mrs. Lamb personally checked them on arrival including the tattoo marks in their ears. Later in the same month Mrs. Lamb expressed her disappointment to Mr. Bangart when he visited the Lambs' ranch that the heifers were not uniform and were not in as good shape as the ones she had previously observed. He reassured her that they were merely suffering the effects of a long trip and would grow out of it. At this time the Lambs refused any further payments until the entire transaction was reduced to a written agreement.

In April, Mr. Bangart sent Fuyard 1st to the International Beef Breeders, hereinafter referred to as I.B.B., for the purpose of collecting his semen. The bull arrived on April 17, 1968 at the I.B.B., and the company's veterinarian, Dr. Leo M. Cropsey, testified that he observed the animal about one hour after its arrival and that it had a lameness in the right hind leg, which in his opinion was caused by nerve paralysis. Dr. Cropsey testified that he telephoned Mr. Bangart, who does not recall the conversation. The telephone bill of I.B.B. verifies that two calls were made to the Bangart ranch on that date. The Lambs testi-

fied that they had no knowledge of the bull's presence at I.B.B., until after the written agreement was executed on May 27, 1968, at which time Mr. Bangart informed them of the location of the bull. The Lambs received a statement from I.B.B. in early June, billing them for the bull's boarding since April 17, 1968. Mr. Bangart vigorously disputed Lambs' claim.

When the Lambs received the billing from I.B.B. and noted that only a small amount of semen had been collected from the bull in the past six weeks, they went to Denver to observe him. The bull had considerable difficulty in walking. Dr. Cropsey testified that during the time the bull remained at I.B.B. there was a gradual paralysis which developed in the hind legs. On October 24, 1968, the Bangarts removed the bull from I.B.B. and returned it to their ranch in Montana. On December 10, 1968 the Bangarts had the bull shot. During the time the bull was at I.B.B., the only viable semen that was retained for breeding purposes was 100 ampules collected on May 6, 1968.

Prior to the bull's departure from I.B.B., Dr. Lamb requested that a blood sample be drawn and sent to Ohio State University for blood typing. The Lambs also arranged to have blood samples from the ten heifers sent to the same institution. On December 6, 1968, the Ohio State Laboratory reported that seven of the ten heifers could not be daughters of Fuyard 1st. Dr. Lamb sent a letter on December 10, 1968 to the Bangarts stating that important representations and promises that had been made were not accurate and had not been fulfilled and therefore he requested rescission. On December 14, four days after the bull had been shot, Mr. Bangart telephoned Dr. Lamb and informed him of the bull's death and stated the letter was too late.

The Bangarts proffered two factual defenses concerning the paternity of the heifers. On the one hand, the dams of the heifers were leased and remained on the ranches of the lessors and they had accepted the word of the inseminators as to the paternity of the heifers. On the other hand, Bangarts went to the Lambs' ranch in June, 1972 and examined the cattle and claimed that the cattle they inspected were not the same as those delivered in April, 1968 and that someone had switched cows. Mr. Bangart in his testimony observed that the cows he examined in 1972 did not appear to be purebred Charolais and exhibited certain Brahma characteristics. The Lambs presented evidence to prove the animals were in fact the same ones delivered by Bangarts.

One of the expert witnesses, Dr. Bell, examined the records of Fuyard's health and semen collection from Cache Valley Breeder's Association and I.B.B. He testified that it was obvious by November 30, 1967 that the bull's breeding abilities were degenerating. He based this opinion on the quality, quantity of the semen as well as the frequency of the ability to collect it. The health records of Cache Valley indicated that in November, 1967, the bull could not hold himself up when he would mount, the right hind leg wouldn't hold his weight. Fuyard 1st was removed from Cache Valley on January 11, 1968 and remained on the Bangarts' ranch until April, 1968, when he was sent to I.B.B. An employee of I.B.B. who assisted in unloading the bull from the truck on its arrival in April observed that the animal was lame in his right rear foot and notified the office to so inform Mr. Bangart. The Bangarts vigorously contested the condition of the bull when it was sent to I.B.B. and contended that the bull sustained a traumatic injury which led to its eventual demise while in the care and custody of I.B.B.

On appeal defendants contend that the trial court erred when it ruled as a matter of law that the date of the contract was May 27, 1968. They urge that this ruling had the effect of directing a verdict in favor of Lambs on the issue of whether Fuyard 1st was a breeder, since he produced no viable semen of breeding quality after May 6, 1968. Defendants contend that it was at least a question of fact whether the date of the contract was March 8, 1968,

the date Mrs. Lamb issued the check for $20,000 or April 17, 1968, the date Fuyard 1st was delivered to I.B.B. Defendants claim that on these earlier dates that the jury might have found that Fuyard was a breeder.

The trial court instructed the jury that any liability of the defendants for the breeding deficiencies, if any, of Fuyard 1st must be determined as of May 27, 1968. Any injury or illness occurring after this date, which affected the breeding capacities of the bull would not be the responsibility of the defendants, and the plaintiffs would not be entitled to recover for such later illness or injury.

■ The real issue was not the date of the agreement for the sale of the breeding interest in the bull per se but the date of the defendants' warranty that he was a breeder. The defendants warranted that Fuyard 1st was a breeder on May 27, 1968.

Section 70A–2–202, U.C.A.1953, as amended 1965, provides:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

. . . .

■ The written livestock sale agreement sets forth that it is a present sale and that title to the livestock purchased shall pass to the buyers upon execution of the agreement. The agreement further provides for the contemporaneous execution of the joint ownership agreement with the Keatings to enable the buyers to collect the semen of the bull. The agreement further recites that Fuyard 1st is located at the Bangart Ranch. The livestock sale agreement was a valid, integrated written contract between the parties covering the subject matter in dispute. Evidence of any prior oral agreement, which contradicts the plain terms of the written agreement is inadmissible under the parol evidence rule, for a party may not establish a different contract on facts known at the time of reducing their understanding to written form. All preliminary negotiations, conversations, and verbal agreements are merged in and superseded by the subsequent written contract, and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be altered by parol evidence.[3]

■ Defendants contend that the trial court erred in not striking the expert testimony of Dr. Bell on the ground that it was based on out-of-court conversations. Dr. Bell, in fact, testified that his opinion was based on the testimony he had heard and the records in evidence. Under such circumstances, his opinion was admissible under Rule 56(2), U.R.E. Dr. Bell testified that he had had conversations with some of the other witnesses out of court, but he based his opinion on the testimony the witnesses gave in court. Defense counsel then queried whether Dr. Bell had relied on anything the witnesses had told him in their conversations. Dr. Bell responded that he had relied on his conversation with these men in making his judgments. Based on the foregoing, defense counsel moved that the opinions of Dr. Bell be stricken:

■ A survey of the record reveals there was ample evidence therein upon which Dr. Bell could base his expert opinion. Although it is a matter of semantics, Dr. Bell may have interpreted the question of defense counsel as to whether the statements of the other witnesses were reliable for purposes of his making a judgment. The trial court is allowed considerable latitude of discretion in the admissibility of expert testimony, and in the absence of a

3. Rainford v. Rytting, 22 Utah 2d 252, 451 P.2d 769 (1969); also see Williston On Sales (4th Ed.), Sec. 13–6, pp. 73, 80.

clear showing of abuse, this court will not reverse. A challenge to the reliability of such expert testimony will be considered as not involving its competency but its weight and credibility, which is a matter for the jury to determine.[4]

Defendants contend that the trial court erred in its ruling that paragraph 4 of the livestock sale agreement did not provide plaintiffs' exclusive remedy in regard to Fuyard 1st.

This paragraph contained a representation that the sellers had 1500 ampules of Fuyard 1st semen on hand on the date of the agreement. The paragraph provided that if the animal died prior to the buyers acquiring 750 ampules, the sellers and buyers would adjust the quantity so that each would have an equal amount. It further provided that if the animal died prior to the buyers receiving 1500 ampules of semen and the payment of $30,000 on January 5, 1969, was not due, the buyers would be exonerated from such payment.

Defendants argue that the parties realized and considered the risk of the death of the bull and, therefore, included a specific provision in case of this contingency. Exoneration of the final payment in the case of the death of the bull and tender of one half of the semen Bangarts had on hand should be plaintiffs' exclusive remedy. It should be noted that Bangarts did not have the number of ampules represented.

Section 70A–2–719(1)(b), U.C.A.1953, as amended 1965, provides that resort to a remedy as provided in the agreement is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy. However, subdivision (2) of this section provides that where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in the act.

The instant action was not predicated on the distribution of risk in case of the death of the bull, but upon breach of an express warranty in paragraph 6 of the agreement that the bull was a breeder as well as the fraud of the defendants in inducing plaintiffs to enter the agreement through their fraudulent misrepresentation.

Section 70A–1–103, U.C.A.1953, as amended 1965, provides that unless displaced by particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to fraud shall supplement its provisions.

Section 70A–2–721, U.C.A.1953, as amended 1965, provides:

Remedies for material misrepresentation or fraud include all remedies available under this chapter for nonfraudulent breach. Neither rescission or a claim for rescission of the contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages of other remedy.

In the instant action, in addition to there being no provision that paragraph 4 provided the exclusive remedy, a contract clause limiting liability will not be applied in a fraud action. The law does not permit a covenant of immunity which will protect a person against his own fraud on the ground of public policy. A contract limitation on damages or remedies is valid only in the absence of allegations or proof of fraud.[5]

Defendants claim that plaintiffs received a duplicate recovery, since they were given an award for a breach of contract concerning the warranty that the bull was a breeder without having paid the full purchase price or acquiring the full interest for which damages were awarded. Defendants claim that they were entitled to an offset for the unpaid purchase price or the jury should have been instructed to consider this fact in assessing damages.

Under Section 70A–2–714(2), U.C.A. 1953, as amended 1965, the measure of

4. Batt v. State, 28 Utah 2d 417, 420, 503 P. 2d 855 (1972).

5. Clements Auto Company v. Service Bureau Corporation, 9 UCC Reptr. Serv. 189 (1971) ; Klein v. Asgrow Seed Company, 246 Cal.App. 2d 87, 54 Cal.Rptr. 609 (1966).

damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. Under subparagraph (3) of this section any incidental and consequential damages may also be recovered in the proper case.

■ This foregoing provision coincides with the rule in this jurisdiction that in an action for fraud and deceit the measure of damages is the difference between the actual value of what the party received and the value thereof if it had been as represented; this is the benefit of the bargain rule.[6] Under this rule the defrauded party is compensated for the loss of his bargain and is not confined to his out-of-the-pocket damages.

Under Section 70A–2–721, U.C.A.1953, as amended 1965, remedies for fraud or material misrepresentation include all remedies available under the chapter for non-fraudulent breach.

"The purpose of this section (2–721) is really twofold. First, it is to provide that in actions based upon material misrepresentation or fraud, the remedies available are not limited but are all of those that are available in Part 7 of Article 2. Second, it is important to note from this section that a party asserting one cause of action will not be held to an election of remedies or actions and shall be entitled to all remedies that may be available."[7]

■ In the instant action, the balance of the unpaid purchase price was irrelevant in determining the measure of damages to which plaintiffs were entitled. The jury was correctly instructed to determine the sum that would compensate plaintiffs for the damages suffered and proximately resulting from the fact that Fuyard 1st was not a breeder.

Defendants contend that the trial court erred in denying their motion for a directed verdict on the ground that there was no clear and convincing evidence to support a finding of fraud.

The trial court fully instructed the jury as to all of the requisite elements to constitute fraud as set forth by this court in Pace v. Parish.[8] The trial court further explained each of the elements must be proven by clear and convincing evidence and that a failure to prove any one of the elements by such standard of proof would require the jury to find against plaintiffs on their complaint of fraud. In Instruction 20, the trial court defined clear and convincing evidence with meticulous detail.

■ In Child v. Child,[9] this court stated that if the evidence appears to be such that reasonable minds acting fairly, reasonably and in good conscience could regard it as being clear and convincing as the ordinary meaning of these words imply, the finding should not be disturbed. The findings and judgment should not be disturbed unless this court can say affirmatively and with some degree of assurance that there is no reasonable basis in the evidence that could fairly and rationally support the requisite degree of proof, i. e., by clear and convincing evidence.

■ A review of the evidence and every reasonable inference that may fairly be drawn therefrom in the light most favorable to the prevailing parties, the plaintiffs, sustains the judgment. The factual issues of this action were vigorously contested by the parties; the jury in its re-

6. Dilworth v. Lauritzen, 18 Utah 2d 386, 424 P.2d 136 (1967).

7. 3A Bender's Uniform Commercial Code Service, Sec. 14.10, p. 14–69; also see Official Comment 2–721: "Purposes: To correct the situation by which remedies for fraud have been more circumscribed than the more modern and mercantile remedies for breach of warranty. Thus the remedies for fraud are extended by this section to coincide in scope with those for non-fraudulent breach . . . ."

8. 122 Utah 141, 144–145, 247 P.2d 273 (1952).

9. 8 Utah 2d 261, 269, 332 P.2d 891 (1958).

sponse to the special interrogatories clearly indicated which version of the transaction was true. The record is replete with evidence, which if believed by the jury, not only sustains a finding of fraud but also that the action of the defendants was wilful and malicious to support an award of punitive damages.[10] The other points raised in this appeal have either been incorporated in other phases of this opinion or do not merit further discussion. This court has previously stated that in any lawsuit of several days duration counsel can usually find matters upon which he may claim error, but this court will not reverse on mere error but only if it be substantial and prejudicial to the extent that there is a reasonable likelihood that unfairness or injustice has resulted.[11]

The judgment of the trial court is affirmed. Costs are awarded to plaintiffs.

HENRIOD, and TUCKETT, J., concur.

ELLETT, Justice (dissenting):

I dissent. The trial court committed error in several particulars. In the first place, Dr. Bell as an expert witness should have based his opinion upon facts stated in the form of a hypothetical question and not upon testimony which he had heard. There was considerable conflict in the testimony given. The witness may have based his opinion upon testimony which the jury did not believe.

However, while this was error, it need not necessarily be reversible error because it could have been cured by cross-examination.

The other errors regarding damages as set out below in my opinion require a new trial.

The Lambs filed their complaint in three counts which they denominated "Causes of Action," to wit:

1. For rescission of the contract;

2. For damages for breach of contract; and

3. For damages for fraud.

By our Rules of Civil Procedure, inconsistent causes of action may be joined in one complaint.[1] This joinder of causes of action does not mean that more than one recovery can be had on one set of facts or that recovery can be had under two inconsistent causes. The principle is important in the instant matter because the trial court submitted a special verdict to the jury, and in its judgment based on the answers to the interrogatories contained in the special verdict the trial court permitted a recovery under two of the theories presented in the complaint, to wit, for breach of contract and for fraud. It awarded punitive damages in the sum of $10,000, which would not be permitted under a breach of contract,[2] and $20,000 attorney's fees, which could not be given in the fraud count. Of course, a party to a contract who is defrauded by the other party may waive the contract provisions and sue for damages based on the tort. If he does so, he may not recover attorney's fees pursuant to the contract.

In this case the appellants did not raise this point on appeal. However, even if there is no assignment of error on appeal, we may notice a matter of law which appears on the face of the record when necessary to do justice between the parties. See Universal Indemnity Ins. Co. v. Tenery, 96 Colo. 10, 39 P.2d 776, 779 (1934), where it is said:

> There is no assignment of error directed to this point, and ordinarily under the well-settled rule it would not be considered by us; but the court may notice questions, not raised by the assignments of error, that appear on the face of the

---

10. Holland v. Moreton, 10 Utah 2d 390, 398, 353 P.2d 989 (1960); Palombi v. D. & C. Builders, 22 Utah 2d 297, 452 P.2d 325 (1969).

11. Ewell and Son, Inc. v. Salt Lake City Corporation, note 2, supra.

1. Rule 18, U.R.C.P.

2. There are some exceptions for punitive damages in contract actions such as in cases of breach of promise to marry and those against common carriers and public service corporations. See McCormick on Damages, Hornbook Series, Section 81; also 25 C.J.S., Damages § 120, p. 1126.

record, when such consideration is necessary to do justice. [Citation omitted.] Included in the total amount of the judgment entered against the garnishee herein was the award of exemplary damages against defendant Callahan in the sum of $1,000 . . . .. The insurance company did not participate in this wrong, and was under no contract to indemnify against such. . . . The injured will not be allowed to collect from a nonparticipating party for a wrong against the public. For the reasons above stated, the judgment should be modified by the deduction of the $1,000 included as exemplary damages.

Also, the case of Wagner v. Coronet Hotel, 10 Ariz.App. 296, 458 P.2d 390, 394 (1969), is in point. In the opinion the court said: "An error going to the foundation of the action will be noticed and reviewed on appeal whether or not it was assigned."

The Lambs made no tender of rescission and apparently abandoned their so-called first cause of action. In the judgment which they caused the judge to sign, they included an award of attorney's fees pursuant to the "Second Cause of Action" and an award of punitive damages under their "Third Cause of Action." They were entitled to have the jury give a verdict on one or the other theory under proper instructions but not on both. Since the questions were answered in the special verdict, it would seem that the election might be made after verdict and the court enter a correct verdict. However, no such election was ever made in this case, and I do not think the error can now be cured.

The prevailing opinion indicates that Section 70A–2–721, Utah Code Annotated 1953, as amended in 1965, permits double recovery. Such is not the case. This section says that rescission and rejection or return of goods are not inconsistent with a claim of damages for fraud and that such a claim may include all remedies under the chapter. Here the Lambs neither rescinded nor rejected the goods, and the section

has no application to this case. Besides, the remedies of the buyer are set out in Section 70A–2–711, and that section does not afford a double recovery.

The Lambs bought ten heifers and promised to pay therefor $25,000. They kept the heifers and were given a judgment in the amount of $33,000 without any deduction for their unfulfilled promise to pay for the cattle. Likewise, the jury answered that the Lambs sustained damages in the amount of $27,500 because of the failure of Fuyard I to be a breeder, without any deduction for the amount remaining unpaid on that animal.

If a defrauded person pays $10,000 for a bull and the animal were worth $10,000 if as represented but only worth $1,000 as it is, then the damage is $9,000, and the purchaser is made whole by getting a judgment for that amount. He has a $1,000 bull and is out only $1,000 ($10,000 minus $9,000) ; but if the purchaser buys the same bull on credit and gets judgment for $9,000 he has the bull and a judgment of $9,000 and is not out one cent. It thus is obvious that the unpaid amount of the purchase price must be deducted from the measure of damages assessed based on the difference between the value as represented and the value as is.

The heifers purchased from the Bangarts were shipped to the Lambs in March of 1968. The court instructed the jury as follows:

If you find that defendants misrepresented the blood lines of the heifers to the plaintiffs, you will then determine the amount of plaintiffs' recovery. The proper measure of damages is the difference between the market value of the heifers if they had been as represented and their value as unregistered heifers on December 1st, 1968.

The court then repeated the instruction word for word with only two intervening instructions.

The instruction is erroneous. The true measure of damages, if any, would be the value of the animals had they been as rep-

resented less their value as they were at the *time of sale*. If there were any special damages accruing because of the fraud or breach of warranty, they should be pleaded and proved. The instruction seems to follow the rule pertaining to land where the plaintiff may recover from a prior warrantor the value of the land at the time of eviction. This rule is not applicable to chattels. This rule is not affected in this case by Section 70A–2–723, U.C.A.1953, as amended in 1965, which provides that in an action based on "anticipatory repudiation" before the time of performance the value of a chattel ,shall be determined as of the time when the aggrieved party learns of the repudiation. This is an action in fraud and is not based on anticipatory repudiation.

I would set aside the judgment and remand for a new trial and would award costs to the appellants.

CROCKETT, J., concurs in the views expressed in the dissenting opinion of ELLETT, J.